STATE OF MINNESOTA ex rel. H. W. CHILDS, Attorney General, v.
· BOARD OF COUNTY COMMISSIONERS OF CROW WING
COUNTY and Others.[1]

October 20, 1896.

Nos. 10,217—(41,[2] 13 [3]).

## Enlargement of County—Petition under Laws 1895, c. 298.

*Held*, the petition provided for in Laws 1895, c. 298, need not state the
number of votes cast at the last preceding general election, and it is not
necessary to show the same by affidavits attached to such petition.

## Sp. Laws 1876, c. 208, Disorganizing Cass County—Res Judicata— Constitution—Changing County Lines—Repeal by Implication.

In State v. McFadden, 23 Minn. 40, this court held constitutional Sp.
Laws 1876, c. 208, disorganizing Cass county. *Held*, the status of Cass
county was there directly involved, and that decision is conclusive in an-
other proceeding involving that status. *Held*, the amendments of 1881 and
1892 to the constitution, being article 4, §§ 33, 34, repeal by implication, and
completely abrogate, all that part of article 11, § 1, requiring laws for
changing the lines of any organized county to be submitted to the electors
thereof before taking effect; and Laws 1895, c. 298, is not unconstitutional
because it contravenes said provisions.

## On Motion for Appointment of a Referee.

January 22, 1897.

## Quo Warranto against County—Illegal Annexation of Territory.

An information in the nature of quo warranto, brought by the attorney
general, will lie against a county to oust it from adjoining territory illegally
annexed to the county, and over which the county has assumed jurisdic-
tion.

## Same—Laws 1895, c. 298—Finding of Commission—Proclamation— Presumption.

*Held*, every presumption is in favor of the finding of the commission, act-
ing under Laws 1895, c. 298, that the petitions presented are conformable
to law, and of the proclamation of the governor made pursuant thereto,
annexing such territory to the adjoining county; but such presumption
may be rebutted by showing that such finding is not supported either by

[1] Reported in 68 N. W. 767; 69 N. W. 925; 73 N. W. 631.
[2] October, 1896, term calendar.
[3] October, 1897, term calendar.

the actual existing facts, or by any competent or proper evidence of such facts.

### Same—Writ and Information—Sufficiency.

*Held*, the writ and information, having admitted such finding and proclamation, is insufficient, because it does not sufficiently allege any facts to rebut such presumption.

## On Report of the Referee.

### January 6, 1898.

### Evidence—Findings of Commission.

*Held*, that it appears that there was no competent evidence before the commission (under Laws 1895, c. 298) to sustain their finding that the petition presented to them was signed by 55 per cent. of the actual residents and legal voters of the territory proposed to be taken from Cass county and attached to Crow Wing county, "as shown by the returns of the last preceding general election." Also, that it appeared from the evidence before this court that the actual facts did not sustain such finding.

### Petition—Withdrawal of Signature.

It was not necessary that one who had signed such petition, but wished to withdraw his name, should appear in person before the commission. It was sufficient if, before the commission had acted on the petition, he communicated to them in writing, so authenticated as to show its genuineness, the fact that he was not in favor of the proposed change, and wished his name withdrawn and not counted in favor of the change. A communication to the effect that he did not understand the nature of the petition when he signed it, that he was opposed to the change, and "hereby asks for an opportunity to strike his name from said petition," is a sufficient withdrawal.

Writ of quo warranto requiring respondents to show by what warrant they exercised jurisdiction, control and authority over certain territory alleged to be a portion of Cass county. The case was heard on the matters set forth in the writ and admitted in the answer, and the questions raised thereon were determined in favor of respondents, and it was ordered that the case stand for further proceedings to be had as to the other allegations in the writ, which were put in issue by the answer, unless the court should be otherwise advised by the parties. Writ of ouster.

*H. W. Childs*, Attorney General, and *M. R. Tyler*, for relator.

The county of Cass was organized by Laws 1872, c. 79, and has never since by any act of its people lost its organization. We claim

it could not be disorganized without a vote of its people.   Sp. Laws 1876, c. 208, an act to attach Cass county to Crow Wing county, having enacted no provision for submitting the proposition to the electors of Cass county, was unconstitutional, and Cass county is still an organized county, and does not come within the purview of Laws 1895, c. 298.   State v. McFadden, 23 Minn. 40, held the act of 1876 unconstitutional.   This court was then composed of three judges, but Chief Justice Gilfillan dissented from the conclusion of the majority of the court in an opinion which is termed one "of great vigor and logical force" in State v. Honerud, 66 Minn. 32, 68 N. W. 323.

*C. E. Chiperfield* and *Wilson & Van Derlip*, for respondents.

Laws 1895, c. 298, is constitutional.   Courts will not declare a law unconstitutional, except where a valid construction is impossible.   Ames v. Lake Superior & M. R. Co., 21 Minn. 241, 282. Where no constitutional restriction is placed, the legislature has absolute control over counties, their establishment, organization, extent, existence, and government.   State v. McFadden, 23 Minn. 40; People v. Whitcomb, 55 Ill. 172.   The language of Const. art. 11, § 1, is so plain there is no room for construction by the court.   It meant no law respecting a change of county lines should go into effect until, after its passage by the legislature, it should be submitted to the electors of the counties affected and duly adopted by them.   The action of the Republican and Democratic constitutional conventions shows that this section was carefully formulated, nor is there any reason why the legislature cannot provide a method of altering existing county lines, either by general law or by special act to be submitted to the people.   At the first session of the legislature a general law was enacted providing for a change of county seats.   Laws 1858, c. 18; Roos v. State, 6 Minn. 291 (428).   That decision was based upon the proposition that the law effecting the change was to be submitted to the people, and not the question as to whether a change should be made.

*Gilfillan, Willard & Willard*, for respondents.

The evil sought to be corrected by article 11, § 1, of the original constitution was the evil of special legislation as to county lines and

county seats, but that evil could not exist under general laws. A general law cannot alter the boundaries of any given county. It can only provide a way in which the people can effect such change if they desire it. The phrase in the constitution "all laws" refers to special laws only. Roos v. State, 6 Minn. 291 (428). The constitutional amendment of 1881 prohibited special legislation changing county seats and that of 1892 special legislation changing county lines. The case of Nichols v. Walter, 37 Minn. 264, 33 N. W. 800, should not now be overruled. If that case is overruled and article 11, § 1, is still in force, there is no power anywhere that can change a county seat or a county line. Under this section they must be changed either by a general law or a special law, and the law must be submitted to the people. But the legislature is prohibited from passing a special law. It is not prohibited from passing a general law, but such law cannot be submitted to the people. Nichols v. Walter was approved in Todd v. Rustad, 43 Minn. 500, 46 N. W. 73. If article 11, § 1, prohibited the passage of general laws, that prohibition has been removed by the amendment of 1881,—article 4, § 34.

CANTY, J. Certain petitions were prepared, and presented to the secretary of state, whereby it was sought, under Laws 1895, c. 298, to detach from the unorganized county of Cass certain territory, and attach the same to the organized county of Crow Wing. The secretary of state and state auditor, two of the members of the commission provided for that purpose by said act, declared said petitions conformable to law; and pursuant thereto the governor issued his proclamation declaring said territory detached from Cass county, and attached to Crow Wing county. This action of these officers was attempted to be reviewed in this court by certiorari, but the writ was quashed. See State v. Clough, 64 Minn. 378, 67 N. W. 202. Thereupon a writ of quo warranto was issued out of this court, on relation of the attorney general, requiring the county commissioners of Crow Wing county to show by what warrant they exercised jurisdiction over said territory. They made a return to the writ, and the matter was brought on for hearing on the matters alleged in the petition and admitted in the return.

1. It is contended by the attorney general that the petitions must

show on their face, or have affidavits attached thereto which will show, the number of votes cast at the last preceding general election in the territory in question, and also in the county to which it is to be attached, so that it will appear that 55 per cent. of the voters in such territory have signed the one petition, and 55 per cent. of the voters in such county have signed the other. In our opinion, the point is not well taken. The statute does not require either petition to state the number of votes so cast. It simply provides that whenever petitions are presented, signed by 55 per cent. of such voters, "as shown by the returns of the last preceding general election," the secretary of state shall file them, etc. Section 2. It also specifies a number of things which the petition shall state, but the number of votes cast at such last general election is not one of those things. Undoubtedly the number of votes so cast should be made to appear to the commission, but that may be done by better evidence than mere affidavits or the recitals in the petitions.

2. We are also asked by the attorney general to overrule the case of State v. McFadden, 23 Minn. 40, and to hold that Sp. Laws 1876, c. 208, disorganizing Cass county and attaching it to Crow Wing county, is unconstitutional, for the reasons stated in the dissenting opinion in that case. Of course, this would make Cass an organized, instead of an unorganized, county, and raise other questions as to the legality of the proceedings in question. We cannot reconsider the questions decided in that case. The status of Cass county and the constitutionality of that act were there directly involved. And whether it is placed on the doctrine of res adjudicata, or that of stare decisis, public policy absolutely prohibits the reconsideration of those questions here. To hold otherwise would result in a most intolerable state of things.

3. Laws 1895, c. 298, aforesaid, provides that any organized county may be enlarged by attaching thereto adjoining territory from an unorganized county. The act prescribes the manner of preparing, signing, and verifying the petitions. When the proper petition, so signed and verified by 55 per cent. of the legal voters of such territory, and the proper petition, so signed and verified by 55 per cent. of the legal voters of such county, are presented and filed, the commission aforesaid shall act on the same; and, if "found to conform to law," they shall so certify, and the governor shall issue his proc-

lamation declaring the territory detached from the unorganized county, and attached to the organized county.

It is urged by the attorney general that this act contravenes section 1, art. 11, of the constitution, and is unconstitutional, because it does not provide for submitting the question of the change of the lines of the organized county to a vote of the electors of that county at the next general election. This section reads as follows:

"The legislature may from time to time establish and organize new counties, but no new county shall contain less than four hundred square miles; nor shall any county be reduced below that amount; and all laws changing county lines in counties already organized, or for removing county seats, shall, before taking effect, be submitted to the electors of the county or counties to be affected thereby, at the next general election after the passage thereof and be adopted by a majority of such electors. Counties now established may be enlarged, but not reduced below four hundred square miles."

In answer to this it is urged by respondents that the amendments of 1881 and 1892 to the constitution completely repealed and abrogated all that part of section 1 which reads as follows:

"All laws changing county lines in counties already organized, or for removing county seats, shall, before taking effect, be submitted to the electors of the county or counties to be affected thereby, at the next general election after the passage thereof and be adopted by a majority of such electors."

It was held in Roos v. State, 6 Minn. 291 (428), that under this section a general law providing for the removal of county seats, and applicable to all counties, was unconstitutional, and that the provisions of the section, at least so far as it applied to county seats, could only be complied with by the passage of special laws. Said amendment of 1881 added sections 33 and 34 to article 4 of the constitution, and provided as follows:

"Sec. 33. The legislature is prohibited from enacting any special or private laws in the following cases: * * * 5. For changing any county seat. * * *

"Sec. 34. The legislature shall provide general laws for the transaction of any business that may be prohibited by section one of this amendment [section 33], and all such laws shall be uniform in their operation throughout the state."

It was said in the case of Nichols v. Walter, 37 Minn. 264, 33 N. W. 800, that this amendment completely abrogated said section 1

of article 11, so far as it applied to the removal of county seats. But as remarked in State v. Clough, supra, what was said on that point was unnecessary to the decision of that case. Said amendment of 1892 amended said section 33 so as to read as follows:

"Sec. 33. In all cases when a general law can be made applicable no special law shall be enacted; and whether a general law could have been made applicable in any case is hereby declared a judicial question, and as such shall be judicially determined without regard to any legislative assertion on that subject. The legislature shall pass no local or special law regulating the affairs of, or incorporating, erecting, or changing the lines of any county, * * * locating or changing county seats; * * * Provided, however, that the inhibitions of local or special laws in this section shall not be construed to prevent the passage of general laws on any of the subjects enumerated."

These amendments are to some extent inconsistent with the part of section 1, art. 11, last above quoted. The question is, to what extent are they thus inconsistent with it,—whether to such an extent as to completely abrogate it, or only to such an extent as to partly abrogate it, leaving still in force the provision requiring the matter of changing the county lines of an organized county to be submitted to a vote of the electors of the county. The later-adopted constitutional provision will, so far as inconsistent with a former one, repeal it by implication, just as a later statute will repeal by implication a former one. Such repeals by implication are not favored. Again, it is fairly to be inferred from the course of these constitutional amendments that it was the intention of the constitution makers to increase the restrictions on the legislative powers as to these subjects of legislation, and not to diminish those restrictions, as they have done if these amendments completely abrogate the provisions of section 1, art. 11, last above quoted. Keeping these things in view, let us proceed to determine whether any of these provisions remain unrepealed by the amendments aforesaid.

These provisions required the law itself to be submitted to the electors of the county or counties to be affected thereby, before taking effect. We do not, as did the court in Roos v. State and Nichols v. Walter, see an insuperable difficulty in reconciling this with the amendment requiring all laws on the subject to be general in their application. Of course, in the absence of such a special constitutional provision permitting the legislature to do so, it cannot delegate

its power to pass laws or to say when they shall become laws.    But that doctrine has no application when the constitution provides that this very thing may be done.    And, while a general law which ex- ists in some counties and does not exist in others may be somewhat anomalous, we have no right to declare the constitution void because. it provides for such a law.

There is, however, an insuperable difficulty in the way of holding that any of these provisions of section 1, art. 11, remain unrepealed by the amendments.    Section 1 not only provides that the law, be- fore taking effect, shall be submitted to the electors of the county, but it also provides that it shall be so submitted "at the next general election after the passage thereof."    It never could have been the intention of the constitution makers that at the next general election after the passage of a general law the electors of each county in the state should vote to determine whether or not that law should exist in that county, so that at some future, unknown time it might be in- voked in proceedings to change the county lines in some unknown manner or to remove the county seat to some unknown place, thus engendering much strife over imaginary matters.    Neither can we reject the words, "after the passage thereof," and insert in place of the same, "after it is proposed to change the county lines or remove the county seat," so that section 1 will provide for submitting the matter to the electors of the county "at the next general election after it is proposed to change the county lines or remove the county seat."    This would most clearly be judicial legislation.    Then it cannot be held that any of the part of section 1, above quoted, re- mains unrepealed, but we must hold that all of the same has been re- pealed by implication by the amendments aforesaid.

This disposes of all the questions raised on the argument, which were submitted on the facts conceded in the writ and answer.    We are not advised whether further proceedings are to be had as to the other allegations in the writ which are put in issue by the answer, and the case stands for such further proceedings, unless we are otherwise advised by the parties.

---

After the filing of the foregoing opinion, the relator presented a motion for an order appointing a referee to take testimony on the

questions of fact put in issue by the pleadings and to fix a time for hearing by the court upon said issues not theretofore disposed of by the court. The motion was made on the writ and answer and on all the files and papers in the case.

*H. W. Childs* and *M. R. Tyler*, for relator.

*Wilson & Van Derlip*, for respondents.

The commission created by Laws 1895, c. 298, is an independent tribunal and its action is final. Its action is neither judicial nor quasi judicial. State v. Clough, 64 Minn. 378, 67 N. W. 202. See Currie v. Paulson, 43 Minn. 411, 45 N. W. 854; Attorney General v. Page, 38 Mich. 286; Attorney General v. Supervisors, 33 Mich. 289; State v. Peterson, 50 Minn. 239, 52 N. W. 655; State v. Dart, 57 Minn. 261, 59 N. W. 190.

January 22, 1897, the following opinion was filed:

CANTY, J. One opinion has already been handed down in this case at this term. The relator now moves for the appointment of a referee to take and report the testimony to prove those allegations in the writ put in issue by the answer. Respondents have raised some additional questions on the motion, and both parties have filed additional briefs.

1. It is contended by respondents that an information in the nature of quo warranto will not lie to try the question whether or not the county officers of Crow Wing county are wrongfully and unlawfully exercising jurisdiction over a portion of the adjoining county of Cass, or to try the question whether or not such alleged portion of Cass county has or has not become a part of Crow Wing county.

Respondents cite the following cases, which hold that this remedy will not lie to prevent a public officer from exercising jurisdiction beyond the territorial limits within which he may rightfully exercise the same. People v. Whitcomb, 55 Ill. 172; Stultz v. State, 65 Ind. 492. In the latter case the court places its decision on the ground that the Indiana Code does not authorize an information in the nature of quo warranto in such a case, but the former case is approved. See, also, High, Extr. Rem. § 618. These authorities hold that injunction, brought by a person specially interested or affected, is the

proper and only remedy in such a case.    See, also, City of Peru v. Bearss, 55 Ind. 576, which so holds.

The theory of these cases seems to be that the mere de facto annexation of territory to a municipal corporation or quasi corporation is always absolutely void as to every one, and can always be attacked collaterally in any action or proceeding in which the question of the status of the territory may be material.    We cannot subscribe to that doctrine.    It may be that, immediately or shortly after the attempted annexation of the territory, a person specially affected thereby would be allowed to attack such alleged annexation collaterally, and enjoin the officers of the municipality to which it was claimed to have been annexed from exercising jurisdiction over it. As to that we express no opinion.    But after such attempted annexation has been confirmed by user, taxes have been levied, expenses incurred, and other rights and liabilities have been created, we are clearly of the opinion that a de facto annexation may exist, which can only be questioned by the proper state authority in a direct proceeding for that purpose.

In the case of State v. Honerud, supra, p. 32, 68 N. W. 323, an attempt was made to question the validity of the annexation of a certain tier of townships to Otter Tail county, after the lapse of 25 years.    If we had found that these townships had never been legally annexed to Otter Tail county, and had allowed Honerud to raise that question in that proceeding (an application for a real-estate tax judgment), what would be the consequence?    All uncollected taxes levied in those townships would be held to be illegally assessed. Every sheriff who ever levied a writ of execution or attachment in those townships would be held to be a trespasser.    Every county officer who ever took part in the appropriation or expenditure of county funds in those townships would be liable to the county for the same.    Every foreclosure sale made by the sheriff pursuant to the statute, and the power of sale contained in every mortgage of lands in those townships, would probably be held void, because made by the sheriff of the wrong county.    The accused in every criminal prosecution could question the competency of the grand and petit jurors residing in those townships.    If such a juror refused to obey the summons and attend court, the judge would first have to try the

question of the legality of the annexation of those towns to the county before proceeding to punish the juror for contempt. There is no end to the questions that would arise if every one were allowed to attack such annexation collaterally every time it would be for his interest to do so, and holding such annexation void on such a collateral attack would result in local anarchy and confusion. Most surely, the well-settled principles of the law will not tolerate any such results, and, as was said in the Honerud case:

"Considerations of sound public policy forbid it, and suggest that the question ought to be considered as a public one, to be raised only by the state itself by quo warranto or other direct proceeding. To permit private individuals to raise the question in collateral proceedings would manifestly result in serious consequences to public and private interests."

It is well settled in this court that an information in the nature of quo warranto will lie directly against the municipal corporation itself, to test the legality of its incorporation, and dissolve it if it is found to be illegally incorporated. State v. Tracy, 48 Minn. 497, 51 N. W. 613; State v. Minnetonka Village, 57 Minn. 526, 59 N. W. 972; State v. Village of Fridley Park, 61 Minn. 146, 63 N. W. 613. The question of the legal existence of a de facto municipal corporation cannot be raised in a collateral proceeding. Cooley, Const. Lim. (6th Ed.) 309; 1 Dillon, Mun. Corp. (4th Ed.) § 43a; Board of Commrs. v. Shields, 62 Mo. 247; Town of Geneva v. Cole, 61 Ill. 397; Coe v. Gregory, 53 Mich. 19, 18 N. W. 541; Rumsey v. People, 19 N. Y. 41.

If an information in the nature of quo warranto is the proper remedy for ousting or dissolving a municipal corporation in toto, we see no reason in principle why it will not lie to oust such a corporation from specific territory over which it is wrongfully exercising jurisdiction, or to dissolve it so far as it covers that territory. The mistake of some of the courts seems to be in assuming that, as to such territory, the corporation may and should in all cases be wiped out as if it had never existed, which is the necessary effect of allowing its existence in such territory to be attacked collaterally. But, where the municipal corporation has acquired a de facto existence in such territory, this assumption is erroneous, and the corporation cannot, as to such territory, be thus wiped out. The state

66 M.—34

is entitled to dissolve it for all future purposes so far as it covers such territory, but not to wipe it out from the beginning, and thereby destroy all rights which have arisen by reason of such de facto existence, and create liabilities from which persons are protected by reason of the same. On the contrary, in settling and adjusting its affairs, the state itself will, as to such past transactions, recognize its de facto existence so far as required by justice and equity.

True, the authorities all lay it down generally that quo warranto will not lie to prevent official acts in excess of jurisdiction, or to correct official misconduct. But, where a municipal corporation has permanently and continuously exercised jurisdiction over territory beyond its de jure limits, the case is not at all analogous to one of mere official misconduct, which is usually of a casual or temporary character, and to correct which quo warranto will not lie.

Neither is the fact that the court should not or cannot completely dissolve the corporation, and end its existence, a sufficient reason why quo warranto will not lie. This court has several times held that an information in the nature of quo warranto will lie to oust from this state a foreign corporation doing business in the state contrary to law, although no attempt was made to dissolve the corporation itself, and it could not be dissolved by our courts. State v. Fidelity & C. I. Co., 39 Minn. 538, 41 N. W. 108; State v. Somerby, 42 Minn. 55, 43 N. W. 689.

To hold that the state, by its executive officers, cannot maintain some proper proceeding to prevent usurpation in the exercise of governmental powers over large tracts of territory within its borders, and that the private individual can do this, would, indeed, be a startling doctrine. Clearly, the state has sufficient interest in such a matter to entitle it to maintain an action to redress the wrong. A proceeding in the nature of quo warranto is the most appropriate remedy. Again, if an information in the nature of quo warranto will lie after the municipal corporation has acquired a de facto existence in the territory, we are of the opinion that it will lie immediately on the assertion by the corporation of jurisdiction over the territory. The state is not obliged to wait until so much time has elapsed that much mischief has been done by the inauguration of the new order of things within such territory, or until much confusion will arise by the dissolution of the municipality so far as it

covers such territory. Then we are of the opinion that such a remedy is the proper one in this case.

2. Respondents further contend that the finding of the commission, followed, as it is, by the proclamation of the governor, is conclusive, and that the courts cannot in any manner review such finding.

Undoubtedly, every presumption is in favor of such finding and proclamation; and, until the relator is able to prove that there were neither facts nor proper evidence of facts to support such finding, it must stand. But if it sufficiently appears that the finding is wholly unsupported either by the actual, existing facts, or by proper evidence thereof, the relator should have judgment. We are also of the opinion that false, ex parte affidavits as to the number of voters residing in the territory in question, or as to any other fact, are not competent and sufficient evidence to sustain such finding, and neither is the false report of some private citizen sent by the commission to ascertain the facts. As the statute does not provide for any hearing on notice before the commission, but leaves the latter to ascertain in its own way whether the petitions are conformable to law, the relator must show, not only that there was no competent evidence before the commission to sustain the finding, but also that the actual facts do not sustain such finding.

Respondents cite Currie v. Paulson, 43 Minn. 411, 45 N. W. 854, to sustain their position that the finding of the commission is conclusive. In that case it was held that the finding of the board of county commissioners as to the number of names properly on a petition for an election for a removal of a county seat is conclusive after the election has been held and such removal carried, and that such election is valid, "notwithstanding any mistake or error committed by the board as to the facts submitted to their determination regarding the names improperly on the petition." This is in line with the general doctrine that irregularities in the steps preliminary to an election will not, after election, vitiate the same, unless the irregularity prevents a fair election on the merits. But such irregularities as were complained of in Currie v. Paulson can be taken advantage of if application is made to the court at the proper time before the election. Slingerland v. Norton, 59 Minn. 351, 61 N. W. 322. However, the irregularities complained of in the present case are not in the preliminary steps, but, so to speak, in the election itself.

It is also urged by respondents that the information and writ herein are defective in failing to allege positively or properly the number of voters residing in the territory in question. Ordinarily, in a proceeding of this character the burden is on the respondent to establish his right to the office or franchise. But in this case the relator himself has alleged the finding of the commission and the proclamation by the governor as aforesaid. This makes a prima facie case for respondent, which it is necessary for relator to rebut, by alleging and proving the want of evidence and facts on which such finding can be based. This he has failed to do.

Leave is given relator to amend the information and writ within ten days from the date of the filing of this opinion. If such amendment is duly made, a referee will be appointed to take the testimony herein, and report to this court; but, if such amendment is not made, the proceeding will be dismissed.

---

The relator having amended the information and writ by inserting new allegations, on February 17, 1897, the court made an order of reference to take testimony. On December 13, 1897, the referee filed his report, and thereafter the cause was submitted upon additional briefs.

*H. W. Childs*, Attorney General, and *M. R. Tyler*, for relator.
*W. A. Fleming* and *McClenahan & Mantor*, for respondents.

The following opinion was filed January 6, 1898:

MITCHELL, J. This proceeding has already been twice before this court. It is now before us on the evidence taken and reported by the referee.

The settled law of the case is that the finding of the commission is not conclusive on the courts; that while every presumption is in favor of such finding, which must stand until the relator proves that there were neither facts nor evidence to support it, yet if it sufficiently appears that the finding was wholly unsupported either by the actual existing facts or by proper evidence thereof the relator should have judgment; that false ex parte affidavits as to the number of voters residing in the territory in question or as to any other

fact are not competent and sufficient evidence to sustain such finding, nor is the false report of some private citizen sent by the commission to ascertain the facts; that the relator must show not only that there was no competent evidence before the commission to sustain the finding, but also that the actual facts did not sustain it. It was also held in the first opinion filed that the number of votes cast in the territory in question at the last general election must be made to appear to the commission.

One of the requirements of the statute (Laws 1895, c. 298) is that there shall be presented to the secretary of state a petition signed by not less than fifty-five per cent. of the actual residents and legal voters of the territory proposed to be attached to said organized county "as shown by the returns of the" "last preceding general election from all the voting precincts within said territory." As all the returns to the county auditor of the last preceding election had been destroyed, secondary evidence was resorted to. The difficulty in proof was further increased by the fact that some of the "voting precincts" were partly within and partly without the territory proposed to be taken from Cass county and attached to Crow Wing county.

The evidence returned goes to three questions, viz.: first, the total number of legal voters residing in the disputed territory; second, the total number registered therein; and, third, the total number of votes actually cast therein at the general election of 1894.

Counsel disagree as to basis upon which the sufficiency of the petition should have been determined by the commission, counsel for the relator contending that it was the registration of voters, while counsel for respondents claim that it was the number of votes actually cast at the last preceding general election. We do not find it necessary to decide which is correct, but shall assume that the contention of the respondents is right. They concede in their brief that the evidence of the relator establishes the fact that ninety-one or ninety-two residents of the disputed territory voted at the general election of 1894. An examination of the evidence satisfies us that this concession is within the actual facts. All of these must be presumed to have been duly qualified voters. To constitute 55 per cent. of 91 there should have been 51 signatures to the petition. The petition contained 67 signatures. We shall assume that

these were all the genuine signatures of legal voters residing in the territory proposed to be detached, although the evidence would seem to be conclusive that this was not true as to several of the signatures.

The right of any of the petitioners to withdraw their signatures at any time before the petition was acted on by the commission was absolute.    This is well settled.

Twenty-five of the 67 did, in writing and under oath, present to the commission, before the petition was acted on, their withdrawal. Of these 25, four recanted their withdrawal, and asked to have their names retained on the original petition.    Conceding their right to do so, there remained 21 who had withdrawn and requested their names to be stricken from the petition before the commission had taken action on it.    This left only 46 signatures to the petition, which was five less than was necessary under the statute.

It is contended, however, that it was necessary that those who wished to withdraw should have appeared in person before the commission, and erased or stricken their names from the petition.    This was unnecessary.    The scheme of the statute is that territory shall be detached from an unorganized county only when it is desired by a certain percentage of the resident voters, to be ascertained in the prescribed way.    If any one who has signed a petition in favor of such change communicates to the commission in writing, so authenticated as to show its genuineness, the fact that he is not in favor of the proposed change, and wishes his name withdrawn from the petition or not counted as in favor of it, this is sufficient.    This is especially true under the statute in question, where the petition is not merely a preliminary to a popular election on the question, but is, so to speak, the election itself.

The "withdrawal" of sixteen of the signers was to the effect that they did not understand the nature of the petition when they signed it; that "we are strenuously opposed to the detachment of that part of Cass county provided for in said petition, and we hereby ask for an opportunity to strike our names from said petition."    It is urged that this did not amount to a "withdrawal"; that asking an opportunity to withdraw is not a withdrawal.    This is altogether too fine a distinction.    When we consider that the right of withdrawal is absolute, and requires no consent or act on part of the commission, and that the purpose of the petition is to show that a certain per-

centage of the legal voters of the territory favor the proposed change, this was a sufficient withdrawal.

It therefore conclusively appears from the evidence that the actual facts did not sustain the finding of the commission.

Neither was there any competent evidence before the commission to sustain their finding. The only documents or evidence before them relating to the territory proposed to be detached were, the petition referred to, a remonstrance purporting to be signed by 104 residents and voters of that territory, the withdrawals already referred to, the affidavits of four resident voters of the territory to the effect that at the time of the last preceding election there were at least 200 legal voters residing therein, and the report of one Williams, appointed by the commission itself to ascertain as nearly as possible the number of legal voters residing in such territory, that he had made such investigation on the ground, and that the result of his inquiry from the best evidence attainable was that the number of legal voters resident in the territory at the date of the last general election was 140, and therefore it would require 77 signatures to the petition.

Much that was contained in these remonstrances, affidavits and report was irrelevant and incompetent; but there is nothing in them in any way tending to prove that the petition, at least after deducting the names withdrawn, contained the required number of signatures. On the contrary, if the contents of these documents are to be considered at all, they all tend to show that the signatures to the petition, after deducting the names withdrawn, constituted a minority, not only of resident voters, or of those registered, but also of the votes actually cast at the last preceding general election.

The result is that a writ of ouster must be issued. So ordered.