**STATE of Minnesota ex rel. Speaker of House of Representatives Hon. Steve SVIGGUM, et al., petitioners, Appellants,**

v.

**Tom HANSON in his official capacity as Commissioner of Finance or his successor, et al., Respondents.**

**No. A06–840.**

Court of Appeals of Minnesota.

May 22, 2007.

■

Erick G. Kaardal, William F. Mohrman, Mohrman & Kaardal, P.A., Minneapolis, MN, for appellants.

Lori Swanson, Attorney General, Kenneth E. Raschke, Jr., Assistant Attorney General, St. Paul, MN, for respondents.

Peter S. Wattson, Senate Counsel, Research, and Fiscal Analysis, St. Paul, MN, for amicus curiae Eighty-fourth Minnesota Senate.

Considered and decided by LANSING, Presiding Judge; WORKE, Judge; and ROSS, Judge.

## OPINION

LANSING, Judge.

This appeal arises out of a district court order authorizing the commissioner of finance to issue checks and process funds necessary to continue core functions of the executive branch after the legislature ended its regular session in May 2005 without funding many executive-branch agencies for the 2005–07 biennium. The temporary funding order expired on July 14, 2005, when the governor signed a bill funding base-level operations for previously unfunded government agencies, provided that the appropriations were retroactive to July 1, 2005, and expressly superseded the district court's appropriations. More than a month later, a bipartisan group of thirty-two legislators brought this quo warranto action challenging the constitutionality of

the commissioner's disbursement of funds without a legislative appropriation. The district court denied the petition, and the group of legislators appeals.

## FACTS

The Minnesota Legislature ended the 2005 legislative session on May 23, 2005, without appropriating the money necessary to fund significant executive-branch functions for the fiscal biennium beginning on July 1, 2005. The same day, the governor exercised his constitutional power to call a special session to allow the legislature to negotiate the necessary appropriations bills.

On June 15, while the legislature was still in special session, the attorney general filed a petition in district court seeking both a declaration that the executive branch must undertake core functions required by the state and federal constitutions and an order requiring the commissioner of finance to fund those functions. Also on June 15, the governor filed a petition to intervene, requesting similar relief. Although the president of the senate and the speaker of the house were served with an order to show cause why the attorney general's petition should not be granted, neither body took part in the temporary-funding proceedings.

On June 23, the district court issued an order authorizing the commissioner of finance to continue to fund core government functions in the event the legislature failed to appropriate the necessary funds before the next fiscal biennium. The order provided that it would remain effective until the earliest of three dates: July 23, 2005; the date of a budget enactment that would fund all core functions after June 30, 2005; or the effective date of a further order of the court. The district court also appointed a special master to identify core government functions.

Various agencies, programs, and individuals filed petitions for funding, and the special master recommended which functions should be funded. The district court adopted the special master's recommendations and issued orders to disburse funds. Under this special-master structure, the commissioner disbursed state funds totaling more than $569,000,000.

On July 8 the legislature appropriated funding, retroactively to July 1, for base-level operations of all agencies whose biennial appropriations had not yet been approved. The governor signed the bill into law on July 9. On July 13 the legislature passed the last remaining biennial appropriation bills. Each bill the legislature passed while in special session contained virtually or exactly the following language:

> Appropriations in this act are effective retroactively from July 1, 2005, and supersede and replace funding authorized by order of the Ramsey County District Court ... as well as by Laws 2005 1st Special Session chapter 2, which provided temporary funding through July 14, 2005.

On July 13 and 14 the governor signed the bills into law. On July 26 the district court issued an order providing that the temporary-funding order expired by its own terms as of July 14.

At the end of August, the bipartisan legislative group (legislators) petitioned the supreme court for a writ of quo warranto against Peggy Ingison, who was then the commissioner of finance, seeking a declaration that the funds the commissioner disbursed under the district court's authorization without a legislative appropriation were unconstitutional and an order requiring the commissioner to cease disbursements. The supreme court dismissed the petition without prejudice, allowing the legislators to file it in district court. The

legislators filed an amended petition in district court, and they and the commissioner filed reciprocal motions for sanctions.

The district court denied the petition for quo warranto, holding that although the legislators had taxpayer standing to restrain the unlawful use of public funds, quo warranto was not the appropriate action to challenge past official conduct. The court noted that quo warranto was instead intended to remedy "a continuing course of unauthorized usurpation of authority." The court also held that the case was moot because it did not present a live case or controversy for which judicial relief was available, and it was not capable of repetition yet likely to evade review. Further, the court held that the legislators' petition was barred by laches because they failed to intervene in the temporary-funding proceedings and instead waited until it was too late for the court to grant relief. Finally, the court concluded that the constitution did not bar judicial action to preserve core government functions pending the necessary appropriations by the legislature. The district court also denied both the legislators' and the commissioner's motions for sanctions.

This appeal follows.

## ISSUES

I. Are the legislators' claims barred by the doctrine of laches?

II. Is quo warranto an appropriate action to challenge the constitutionality of official conduct that is not ongoing?

III. Are the issues raised in this litigation justiciable?

IV. Did the district court abuse its discretion by denying the legislators' motion for attorneys' fees and costs incurred in responding to the commissioner's motion for sanctions?

## ANALYSIS

### I

■ As a preliminary matter, we consider the legislators' challenge to the district court's determination that their petition is barred by the doctrine of laches. The equitable doctrine of laches is available to prevent the granting of relief to a party who has unreasonably delayed the assertion of a legal right and has thereby prejudiced others and made it inequitable for the court to grant the relief requested. *Aronovitch v. Levy*, 238 Minn. 237, 242, 56 N.W.2d 570, 574 (1953); *Fetsch v. Holm*, 236 Minn. 158, 163, 52 N.W.2d 113, 115 (1952).

The district court determined that the doctrine of laches precluded the granting of equitable relief because the legislators had notice of the temporary-funding proceedings but failed to assert an objection. Instead, they waited approximately six weeks from the time the governor signed the last appropriation bill into law before asserting their rights, thereby prejudicing respondents. The legislators argue that they were unable to participate because they are precluded during the legislative session from becoming parties to a legal proceeding by the provisions of Minn.Stat. § 3.16 (2006).

■ We reject the legislators' argument that they are precluded from participating as parties in a legal proceeding while the legislature is in session. Section 3.16 does not prohibit legislators from participating in judicial proceedings. It only authorizes the postponement of a judicial or quasi-judicial proceeding in which a legislator is involved as a party, attorney, or witness while the legislature is in session. The section states:

No cause or proceeding ... in which a member ... of ... the legislature is a party, attorney, or witness shall be tried or heard during a session of the legislature or while the member ... is attending a meeting of a legislative committee or commission when the legislature is not in session. The matter shall be continued until the legislature or the committee or commission meeting has adjourned.

The member ... may ... waive this privilege. The cause or proceeding ... may then be tried or heard at a time that will not conflict with legislative duties.

*Id.* Section 3.16 thus affords legislators a privilege, which they are free to exercise or to waive, but it does not insulate them from a failure to appear in the proceedings and preserve their options. That said, a decision not to appear does not result in laches unless it unreasonably delays the assertion of their right to raise their constitutional challenge, prejudices others, and makes it inequitable for the court to grant the relief requested.

■ The legislators may have forgone an opportunity to participate in the initial proceeding that resulted in the district court's approval of the commissioner's disbursement of public funds. But on this record, we cannot conclude that they unreasonably delayed the assertion of their rights to question the constitutionality of the resulting decision. They may have reasonably decided not to become individually or collectively enmeshed in a judicial proceeding while they were trying to pass a budget. Furthermore, the commissioner has not established that she was prejudiced by the delay. For these reasons, we conclude that the doctrine of laches does not preclude relief for the legislators' request for a writ of quo warranto. Accord-ingly, we reverse the district court's determination on laches.

## II

■ The writ of quo warranto is a special proceeding designed to correct the unauthorized assumption or exercise of power by a public official or corporate officer. *State ex rel. Danielson v. Village of Mound,* 234 Minn. 531, 542, 48 N.W.2d 855, 863 (1951) (defining quo warranto as remedy to correct "usurpation, misuser, or nonuser of a public office or corporate franchise"). The writ requires an official to show before a court of competent jurisdiction by what authority the official exercised the challenged right or privilege of office. *State ex rel. Burnquist v. Village of North Pole,* 213 Minn. 297, 303, 6 N.W.2d 458, 461 (1942). The writ has both a statutory and a common-law basis. *Danielson,* 234 Minn. at 537–38, 48 N.W.2d at 860; *see generally* Stefan A. Riesenfeld et al., *Judicial Control of Administrative Action by Means of the Extraordinary Remedies in Minnesota,* 33 Minn. L.Rev. 569, 571 (1949) (describing history of writ of quo warranto).

■ Typically, quo warranto is an appropriate action to challenge a person's title to or qualifications for office or the constitutionality of a statute under which a person holds office. *State ex rel. Todd v. Essling,* 268 Minn. 151, 151, 128 N.W.2d 307, 309 (1964) (involving quo warranto proceeding challenging authority of individual claiming office as member of Board of Tax Appeals); *Miller v. Berg,* 190 Minn. 352, 356, 251 N.W. 682, 683 (1933) (stating quo warranto proper proceeding to determine whether person elected to public office is citizen and eligible to hold office); *State ex rel. Douglas v. Westfall,* 85 Minn. 437, 438, 89 N.W. 175, 175 (1902) (involving quo warranto proceeding inquiring into constitutionality of statute by which title

examiner claimed right to office); *see generally* Stefan A. Riesenfeld et al., *Judicial Control of Administrative Action by Means of the Extraordinary Remedies in Minnesota,* 37 Minn. L.Rev. 1, 4–7 (1952) (discussing action subject to control by writ of quo warranto).

■ Quo warranto is not ordinarily available, on the other hand, to challenge the manner of exercising powers conferred by law or the validity of conduct that would result in liability but would not be grounds for forfeiture of a public office or corporate franchise. *See State ex rel. Lommen v. Gravlin,* 209 Minn. 136, 137, 295 N.W. 654, 655 (1941) (stating that "quo warranto is not allowable as preventative of, or remedy for, 'official misconduct and cannot be employed to test the legality of the official action of public or corporate officers' "); *State ex rel. Childs v. Bd. Com'rs of Crow Wing County,* 66 Minn. 519, 530, 69 N.W. 925, 926 (1897) (distinguishing between proper use of quo warranto to correct municipal corporation's "permanent[ ] and continuous[ ]" exercise of jurisdiction beyond its territory and "mere official misconduct ... of a casual or temporary character" for which "quo warranto will not lie"); *see also State ex rel. Grozbach v. Common Sch. Dist. No. 65,* 237 Minn. 150, 159–60, 54 N.W.2d 130, 136 (1952) (concluding quo warranto was proper proceeding to test validity of organization of consolidated school district but not validity of consolidated district's assumption of bonded indebtedness).

Minnesota courts have recognized, nonetheless, that "[a]cts in excess of power may undoubtedly be carried so far as to amount to a misuser of [a public office or corporate franchise] and a ground for its forfeiture." *State ex rel. Clapp v. Minn. Thresher Mfg. Co.,* 40 Minn. 213, 226, 41 N.W. 1020, 1025 (1889). But "[h]ow far [unauthorized conduct] must go to amount to [forfeiture] the

courts have wisely never attempted to define, except in very general terms, preferring the safer course of adopting a gradual process of judicial inclusion and exclusion as the cases arise." *Id.*

■ Through this gradual process of judicial inclusion and exclusion, the quo warranto remedy has expanded beyond its initial limits of addressing only conduct that justified forfeiture of a public office or corporate franchise. Quo warranto will now lie against unauthorized conduct that threatens a substantial public injury but is not necessarily grounds for dissolution of a corporate franchise or ouster from office. *See, e.g., Rice v. Connolly,* 488 N.W.2d 241, 242–43 (Minn.1992) (issuing quo warranto writ invalidating legislation authorizing teleracing and telephone betting and requiring discontinuance of all off-track betting); *State ex rel. Mattson v. Kiedrowski,* 391 N.W.2d 777, 783 (Minn.1986) (issuing quo warranto writ invalidating statute by which legislature transferred responsibilities of state treasurer to commissioner of finance and requiring that transferred functions be returned to state treasurer); *Childs,* 66 Minn. at 529, 69 N.W. at 926 (stating that "[i]f an information in the nature of quo warranto is the proper remedy for ousting or dissolving a municipal corporation in toto, we see no reason in principle why it will not lie to oust such a corporation from specific territory over which it is wrongfully exercising jurisdiction, or to dissolve it so far as it covers that territory").

Despite this gradual evolution, Minnesota courts have been consistent in declining to apply quo warranto to an unauthorized exercise of power that is not ongoing; courts have refused to extend the doctrine of quo warranto to test the legality of either pending conduct or official conduct that has been completed. *See, e.g., State ex rel. Graham v. Klumpp,* 536 N.W.2d

613, 614 n. 1 (Minn.1995) (involving challenge to governor's request for attorney general to prosecute certain individuals and seeking dismissal of indictments obtained by attorney general); *State ex rel. Olsen v. Bd. of Control,* 85 Minn. 165, 166, 88 N.W. 533, 533–34 (1902) (involving proceedings against board of control to test constitutionality of statutory transfer of school management to newly created board of control); *cf. AFSCME Council 6 v. Sundquist,* 338 N.W.2d 560, 564 (Minn. 1983) (stating that quo warranto petition seeking to prevent enforcement of legislation increasing government employees' existing contribution to pension funds did not "fit[ ] within the nature of quo warranto").

The legislators contend that in *Mattson* the supreme court extended the use of quo warranto to challenge past conduct. But *Mattson* involved a challenge to a continuing course of conduct—the transfer of functions from the state treasurer to the commissioner of finance. 391 N.W.2d at 788–80. Had the writ not issued, the commissioner of finance would have continued to exceed the powers of his office by exercising the functions of the state treasurer. *Mattson* thus weighs against the argument that quo warranto is available to adjudicate past violations that have expired. The legislators have cited no cases in which quo warranto was appropriately used to correct conduct that was not ongoing, and they have not demonstrated an ongoing usurpation of power by the commissioner.

 Because it is well-established that the quo warranto remedy may be applied only to an ongoing exercise of power, we conclude that quo warranto cannot be used to challenge the constitutionality of completed disbursements of public funds. The order authorizing the commissioner to fund core executive functions expired by its own terms on July 14, 2005,

after the legislature appropriated the necessary funds and the governor signed the appropriations bills. The commissioner ceased the challenged disbursements on July 14, 2005. When the legislators served the quo warranto petition more than a month later, the commissioner was involved in no ongoing conduct that could be remedied by the issuance of a quo warranto writ.

What the legislators seek, in essence, is not a writ to correct an ongoing usurpation of power but a declaration that the judiciary lacks the power to authorize an executive officer to disburse funds without an appropriation by law. Quo warranto is not an appropriate action to attempt to obtain this relief. Despite the unsuitability of quo warranto as a procedure to challenge the constitutionality of the contested disbursements, we are reluctant, for two reasons, to dismiss this dispute solely because of the scope of the writ.

First, the supreme court has acknowledged that, despite the history and unique nature of a writ of quo warranto, the court has only recently attempted to "definitively proscribe[ ] its use or address[ ] its utility or its appropriateness in the modern judicial context." *Rice,* 488 N.W.2d at 243. As a result, the court has exercised varying amounts of discretion in determining how to proceed on quo warranto petitions. *See id.* at 244 (describing procedural mechanisms that supreme court has used in responding to quo warranto petitions).

Second, the legislators' difficulty in finding an appropriate procedural mechanism relates directly to the foundational issue in this litigation, which we address in Section III. That issue, which we believe is dispositive, is the justiciability of the legislators' collateral challenge to the constitutionality of the commissioner's court-approved disbursements of public funds following a legislative appropriation that is retroactive

and supersedes the commissioner's court-approved disbursements.

## III

When it denied the writ, the district court reasoned that the legislators had limited standing and that the case was moot. Mootness and standing are overlapping doctrines that fall under the broader concept of justiciability. Erwin Chemerinsky, *A Unified Approach to Justiciability*, 22 Conn. L.Rev. 677, 678–87 (1990). Standing "focuses primarily on the *party* seeking to get his complaint" resolved by the court. *United States v. Richardson*, 418 U.S. 166, 174, 94 S.Ct. 2940, 2945, 41 L.Ed.2d 678 (1974). Mootness, in contrast, seeks to ensure that a sufficient personal interest continues to exist throughout the litigation. *Kahn v. Griffin*, 701 N.W.2d 815, 821 (Minn.2005).

■ Justiciability doctrines—including mootness and standing—all relate, in some manner, to the court's ability to redress an injury through coercive relief. *See State by Humphrey v. Philip Morris Inc.*, 551 N.W.2d 490, 493 (Minn.1996) (linking standing to availability of relief); *In re Schmidt*, 443 N.W.2d 824, 826 (Minn. 1989) (noting that case is moot if courts cannot "grant effectual relief"); *see also Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962) (requiring judicially manageable standards for resolving a dispute). The concept of justiciability forms a threshold for judicial action and requires, in addition to adverse interests and concrete assertions of rights, a controversy that allows for specific relief by a decree or judgment of a specific character as distinguished from an advisory opinion predicated on hypothetical facts. *Holiday Acres No. 3 v. Midwest Fed. Sav. & Loan Ass'n of Minneapolis*, 271 N.W.2d 445, 447 (Minn.1978). When a lawsuit presents no injury that a court can redress, the case must be dismissed for lack of justiciability.

■ This redressable-injury requirement—and the corollary rule against advisory opinions—is rooted in constitutional text, the nature of judicial decision-making, and prudential concerns. The constitutional function of Minnesota courts is to resolve disputes and to adjudicate private rights. *See Montgomery v. Minneapolis Fire Dep't Relief Ass'n*, 218 Minn. 27, 29–30, 15 N.W.2d 122, 124 (1944) (interpreting predecessor of Minn. Const. art. VI, § 3, to require that "the subject matter of the suit is a justiciable one and therefore within the competence of the district court to hear and determine"); *In re Application of the Senate*, 10 Minn. 78 (1865) (noting that separation-of-powers provision in Minn. Const. art. III, § 1, limits court to "judicial" acts). Because the nature of judicial decision-making is to resolve disputes, the "judicial function does not comprehend the giving of advisory opinions." *Izaak Walton League of Am. Endowment, Inc. v. Minn. Dep't of Natural Res.*, 312 Minn. 587, 589, 252 N.W.2d 852, 854 (1977). And, as part of our tripartite constitutional structure, the judiciary must act prudentially to abstain from encroaching on the power of a coequal branch. *See Sharood v. Hatfield*, 296 Minn. 416, 423, 210 N.W.2d 275, 279 (1973) (cautioning courts to exercise restraint in dispute over "what is a legislative prerogative and what is a judicial function").

■ In the absence of a redressable injury, Minnesota courts will exercise judicial power only in narrowly-defined circumstances. First, to prevent injury and conserve judicial resources, we will issue declaratory judgments. Minn.Stat. § 555.01 (2006). The senate counsel's amicus brief encourages us to resolve this dispute using a declaratory judgment. But declaratory relief still requires a case

or controversy, and we will not issue "declarations upon remote contingencies or as to matters where the plaintiff's interest is merely contingent upon the happening of some event in the future." *Seiz v. Citizens Pure Ice Co.*, 207 Minn. 277, 283, 290 N.W. 802, 805 (1940). Thus, if we lack the power to modify the district court's appropriations decision, we cannot issue a declaratory judgment. *See Cincinnati Ins. Co. v. Franck*, 621 N.W.2d 270, 273–74 (Minn. App.2001) (limiting declaratory relief to genuine conflicts in tangible interests).

■■■ Second, if a case is no longer redressable because it has become moot, we will issue a decision if the issue presented is capable of repetition but likely to evade review. *Kahn*, 701 N.W.2d at 821. The rationale for this exception is that to "abandon the case at an advanced stage may prove more wasteful than frugal." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 192, 120 S.Ct. 693, 710, 145 L.Ed.2d 610 (2000). But the capable-of-repetition exception cannot revive a dispute that was moot before commencement of the action. *Id.* at 191, 120 S.Ct. at 709. When the legislators petitioned for a writ of quo warranto in August 2005, the commissioner had already allocated the court-ordered funding and the legislature had explicitly superseded and replaced the commissioner's disbursements. Because the relevant circumstances remained the same throughout the litigation, the capable-of-repetition exception cannot be used to revive the controversy if it was not redressable at the time it was brought.

■■■ In addition, Minnesota courts will act without directly redressing an injury in at least two other circumstances. Appellate courts will answer certified questions. *See, e.g.,* Minn.Stat. § 480.065, subd. 3 (2006) (permitting supreme court to answer questions certified by federal courts

and appellate courts in other states); Minn. R.Crim. P. 28.03 (permitting district courts to certify criminal-law questions to court of appeals). But this case does not involve a certified question. Also, under special circumstances, we will issue purely prospective rulings. *See State v. Baird*, 654 N.W.2d 105, 110–11 (Minn.2002) (outlining function and limits of special-circumstances rule). The special-circumstances test, however, does not permit us to issue substantive decisions about injuries that we cannot redress. Instead, the test permits us to decline to redress injuries in the interests of fairness. *Id.*

■■■ Because none of the exceptions that allow us to exercise judicial power in the absence of a redressable injury applies, we return to our threshold principle: judicial action is sustainable only when the controversy presents an injury that a court can redress. For reasons that relate directly to the separation of powers and the explicit provisions of the legislature's retroactive and superseding appropriations bill, we conclude that the issue raised in this litigation is not redressable.

We start from the fundamental principle that we cannot exercise powers that belong to the legislative branch. Minn. Const. art. III, § 1. The Minnesota Constitution provides the legislature with the power to make appropriations. Minn. Const. art. XI, § 1. And, "[w]ithin the constitutional limits of their jurisdiction," members of a coequal branch "have an independence of official action no less complete and no less important than that of the judiciary." *Rockne v. Olson*, 191 Minn. 310, 313, 254 N.W. 5, 7 (1934). Before the legislators brought this action, the legislature, acting as a whole, passed the appropriations for the 2005–2007 fiscal biennium. This enactment expressly stated that the appropriations were retroactive to July 1, 2005, the inception of the bienni-

um, and that they superseded and replaced the funding authorized by the district court.

We attach significance to the legislature's express language in making the appropriation bill retroactive to the beginning of the biennium and providing that the appropriation "supersedes" the action of the district court in authorizing the executive disbursements. The legislature essentially voided the commissioner's disbursement of public funds and reasserted its power to appropriate public funds by choosing to make its action retroactive and superseding. *See Black's Law Dictionary* 1479 (8th ed.2004) (defining "supersede" as "[t]o annul, make void, or repeal by taking the place of").

By its plain terms, the legislative enactment takes precedence over the interim funding and asserts its appropriation as the basis for the funding. We are required to take the legislature at its word. *See* Minn.Stat. § 645.16 (2006) (imposing "plain-meaning" rule). Thus, the issue raised in this action has been conclusively resolved by legislative determination, not judicial action. The legislature has exercised its fundamental constitutional power to appropriate the public funds and to provide that the appropriations are retroactive to the beginning of the biennium and supersede the court-approved disbursement by the commissioner. The judiciary does not have the constitutional power to "relegislate" the effect of the legislature's appropriations decisions. Not only is the question nonjusticiable from the courts' standpoint, but, because of the structure and function of legislative power, it is the legislature and not the judiciary that has the institutional competency to devise a prospective plan for resolving future political impasses. The legislature could prevent another judicially mandated disbursement of public funds without an

authorized appropriation by, for example, creating an emergency fund to keep the government functioning during a budgetary impasse or enacting a statute setting forth the procedures to be followed during a budgetary impasse. *See* S.F. 87 (1st Spec.Sess.2005) (proposing enactment of amendment that would provide for maintenance and preservation of core and essential services).

We recognize the legislators' compelling argument that the commissioner's court-approved disbursements interfered with their appropriations power and improperly affected the dynamics of the legislative process during the special session. If so— and we do not decide the issue—then the damage has already been done, and it is not subject to judicial redress or remedy at this point in time. An advisory opinion ignoring the plain language of the legislature's retroactive appropriations, which replaced and superseded the commissioner's court-approved disbursements, would only compound the injury. If the events of 2005 repeat themselves, the legislators can raise a timely challenge to seek a judicial remedy for their asserted injury.

### IV

■ The legislators assert, for two reasons, that the district court abused its discretion by denying their motion for attorneys' fees and costs incurred in responding to the commissioner's motion for sanctions.

■ The legislators first argue that they are entitled to recover the fees and costs they incurred defending against the commissioner's motion for sanctions because the motion was frivolous and failed to comply with the procedural requirements of rule 11 of Minnesota Rules of Civil Procedure. We are not persuaded that the commissioner's motion was frivolous; the commissioner's concerns about

whether the alleged injury was justiciable gave her a reasonable basis for moving for sanctions. And although the commissioner failed to comply with rule 11 by filing her motion at the same time as it was served, the failure to comply with rule 11's procedural requirements does not automatically entitle the legislators to costs and attorneys' fees; instead, whether to order costs and fees is a matter within the district court's broad discretion. *See Pratt Inv. Co. v. Kennedy,* 636 N.W.2d 844, 851 (Minn.App.2001) (stating that this court reviews district court's decision to allow or deny sanctions for abuse of discretion).

The legislators' second claim is that they are entitled to attorneys' fees and costs because they were prejudiced by the filing of the motion for sanctions. Despite the commissioner's failure to serve the motion for sanctions twenty-one days before filing it with the court, the legislators had more than twenty-one days before the hearing to withdraw the challenged claims and defenses but they chose not to act. Thus, compliance with the procedural requirements would not have lessened the alleged prejudicial effect of the motion for sanctions.

Accordingly, we conclude that the district court did not abuse its discretion by denying the legislators' motion for fees and costs they incurred defending against the commissioner's motion for fees.

## DECISION

We reject the district court's conclusion that this case is barred by the doctrine of laches. Nonetheless, the district court did not err by concluding that quo warranto is an improper proceeding to challenge official conduct that is not ongoing. Although we agree that the case is nonjusticiable, we rest that determination on the legislature's constitutionally significant decision to retroactively appropriate public funds that ef-

fectively and expressly superseded the commissioner's temporary actions of distributing funds under a court order without an appropriation. Finally, the district court did not abuse its discretion by denying the legislators' motion for fees and costs incurred in opposing the commissioner's motion for sanctions

**Affirmed in part, reversed in part.**