James I. RICE, Petitioner,

v.

Carol CONNOLLY, Mark Custer, Dan Gustafson, Stephen Lawrence, Thomas Metzen, Richard Pemberton, Cynthia Piper–Schuneman, Robert Zevnick, each in their capacity as members of the Minnesota Racing Commission; et al., Hubert H. Humphrey, III, Attorney General of the State of Minnesota, Respondents,

Ladbroke Racing Canterbury, Inc., Wayne Simoneau, Gordon W. Bredeson, in his capacity as Vice President of the Minnesota Division of the Horseman's Benevolent and Protective Association, Randall Sampson, in his capacity as President of the Minnesota Thoroughbred Association, Inc., Intervenors–Respondents.

No. C6–92–8.

Supreme Court of Minnesota.

July 31, 1992.

Rehearing Denied Sept. 3, 1992.

Frank Walz, Timothy A. Sullivan, Caryn S. Glover, Best & Flanagan, Minneapolis, for petitioner.

James A. Terwedo, Scott County Atty., Brian A. Nasi, Asst. County Atty., and Karen E. Marty, Shakopee City Atty., Shakopee, for City of Shakopee and County of Scott, amici curiae.

Corey J. Ayling, Henry M. Helgen, III, McGrann, Shea, Franzen, Carnival, Straughn & Lamb, Minneapolis, for Allied Charities.

Wayne G. Popham, Kevin P. Staunton, Popham, Haik, Schnobrich & Kaufman, Ltd., Minneapolis, for Carol Connolly, et al.

Hubert H. Humphrey, III, Atty. Gen., Catharine F. Haukedahl, Sol. Gen., Kenneth E. Raschke, Jr., Asst. Atty. Gen., St. Paul, for Hubert H. Humphrey, III, Atty. Gen.

Peter S. Popovich, Timothy E. Marx, Briggs & Morgan, P.A., St. Paul, for Ladbroke Racing Canterbury, Inc.

Wayne Simoneau, pro se.

Cort C. Holten, Chestnut & Brooks, P.A., Minneapolis, for Gordon W. Bredeson.

Joseph S. Friedberg, Minneapolis, for Randall Sampson.

KEITH, Chief Justice.

On petition of James I. Rice for a writ of quo warranto,[1] we remanded these proceedings to the Ramsey County District Court for its consideration of the petitioner's implicit challenge to the constitutionality of both 1991 Minn.Laws ch. 336, art. I amending Minn.Stat. §§ 240.01–240.29 (Supp. 1991), expanding the licensing authority of the Minnesota Racing Commission, and Minnesota R. 7873.0400 (1991) which details the requirements for telephone account wagering. We hold that because article X, section 8 of the Minnesota Constitution explicitly limits legislative prerogative to the

---

1. More precisely, the petitioner filed what has evolved into an information in the nature of quo warranto requesting this court to exercise its discretion to allow a private individual acting without the consent of the attorney general to petition the court for a writ of quo warranto. *See State ex rel. Danielson v. Village of Mound,* 234 Minn. 531, 48 N.W.2d 855 (1951).

authorization of "on-track parimutuel betting on horseracing," the challenged legislation and rule which purport to expand the authority of the racing commission are declared unconstitutional and invalid and any actions proposed by the commission in accordance with that legislation are deemed unauthorized and impermissible. The writ of quo warranto shall issue to the Minnesota Racing Commission.

We first take this opportunity to clarify the procedural posture of this action and to define, for the future, the proper method of asserting challenges similar to those offered herein. James Rice filed a document designated as a petition for a writ of quo warranto in this court, invoking the original jurisdiction of the supreme court pursuant to Minn.Stat. § 480.04 (1990), urging a determination that teleracing and telephone account wagering are beyond the scope of the betting authorized by the citizenry in the 1982 approval of the constitutional amendment. The petition named, among others, the Attorney General of the State of Minnesota as a respondent; the attorney general neither consented to nor joined in the petition.[2] Because it was unclear whether facts were disputed and because we determined that the development of an evidentiary record was necessary to this court's consideration of the petition, we remanded the matter to the Ramsey County District Court for all further proceedings, including its consideration of then pending motions to intervene filed on behalf of individuals and organizations with an asserted interest in the outcome of this litigation. We retained jurisdiction over the petition as it was filed, deferring our decision as to whether the issuance of the writ on either a substantive or procedural basis was appropriate.

On remand, Ladbroke Racing Canterbury, Inc., which operates the Canterbury Downs racetrack facility (Canterbury), and Wayne Simoneau, Chair of the House of Representatives Appropriations Committee, were granted intervention as of right pursuant to Minn.R.Civ.P. 24.01, and Gordon W. Bredeson, Vice President of the Minnesota Division of the Horsemen's Benevolent and Protective Association, and Randall Sampson, President of the Minnesota Thoroughbred Association, Inc. were granted permissive intervention pursuant to Minn. R.Civ.P. 24.02. After its expedited hearing, the district court concluded that the 1982 constitutional amendment, article X, section 8, limited the legislature to the authorization of on-track betting alone and that the legislature and commission exceeded their authority in enacting off-track teleracing legislation and telephone account wagering rules respectively.

The petition for a writ of quo warranto and an information in the nature of quo warranto have enjoyed an unique and varied history in this state and arise both pursuant to statutory authority[3] and at common law.[4] Admittedly, this court has never definitively proscribed its use or addressed its utility or its appropriateness in the modern judicial context. For our purposes today, it is sufficient to comment that the proceedings contemplated by the petition or the information have often existed side by side with other remedies.[5]

---

**2.** The district court determined on remand that the attorney general was a necessary party to these proceedings in quo warranto; that designation is not relevant to the threshold question relating to the necessity of the consent of the attorney general to the filing of the petition, rather than an information in the nature of quo warranto, by the private individual.

**3.** Minn.Stat. ch. 556 (1990).

**4.** This court discussed the historical evolution of the writ of quo warranto and of the information in the nature of quo warranto in *State ex rel. Danielson v. Village of Mound,* 234 Minn. 531, 48 N.W.2d 855 (1951). *See generally,* Stefan A. Riesenfeld, John A. Bauman & Richard C. Max-

well, *Judicial Control of Administrative Action by Means of the Extraordinary Remedies in Minnesota,* 37 Minn.L.Rev. 1 (1952).

**5.** *See Williams v. Rolfe,* 257 Minn. 237, 101 N.W.2d 923 (1960) (where we commented that while an information in the nature of quo warranto could be utilized to challenge the consolidation of a school district, the declaratory judgment action, Minn.Stat. ch. 555, or an action for usurpation of office, Minn.Stat. ch. 556, would also lie). *See also Latola v. Turk,* 310 Minn. 395, 247 N.W.2d 598 (1976); *State ex rel. Burnquist v. Village of North Pole,* 213 Minn. 297, 302, 6 N.W.2d 458, 460 (1942); *State ex rel. Whitcomb v. Otis,* 58 Minn. 275, 277, 59 N.W. 1015, 1016 (1894).

It therefore seems appropriate to discuss the modern utility of proceedings in quo warranto. We start first with the proposition that while by operation of Minn. Const. art. VI, § 2 and Minn.Stat. § 480.04 (1990), this court is vested with original jurisdiction to issue any writs and processes, including quo warranto, as "necessary to the execution of the laws and the furtherance of justice," Minn.Stat. § 480.04 (1990) we have exercised that discretion infrequently and with considerable caution.

While at one time, quo warranto was also available in the district court, Minn.Stat. § 484.03 (1957), the writ was abolished in that court in 1959 with our original adoption of the Rules of Civil Procedure. *See* Minn.R.Civ.P. 81.01(2), effective July 1, 1959. With that abolition came the technical loss of that forum as a finder of fact when there existed substantial factual issues. As a practical consequence of that abolition, we have been required on a number of occasions to remand proceedings to the district court to serve as a referee to resolve the factual disputes,[6] and to provide us with an adequate record with which we might effectively resolve the controversy. On other occasions we have denied the petition with instructions that the action be commenced as a declaratory judgment action in the district court[7] or have remanded the proceedings to the district court for trial as a declaratory judgment action.[8]

With increasing frequency, the complexity of these issues of public significance has required reliance upon the district court for its development of a record, a function that an appellate court is ill-equipped to perform, and for its disposition of the substantive issues. *See, e.g., Seventy–Seventh Minnesota State Senate v. Carlson*, 472 N.W.2d 99 (Minn.1991) (where we dismissed the petition filed pursuant to Minn. Stat. § 480.04 (1990) to allow the parties to recommence the action pursuant to Minn. Stat. ch. 555 (1990), the Uniform Declaratory Judgments Act, in the district court).

Accordingly, we have determined that quo warranto jurisdiction as it once existed in the district court must be reinstated and that petitions for the writ of quo warranto and information in the nature of quo warranto shall be filed in the first instance in the district court. While this court retains its original jurisdiction pursuant to Minn.Stat. § 480.04 (1990), we today signal our future intention to exercise that discretion in only the most exigent of circumstances. We comment further that the reinstatement of quo warranto jurisdiction in the district court is intended to exist side by side with the appropriate alternative forms of remedy heretofore available. *See, e.g., Williams v. Rolfe*, 257 Minn. 237, 101 N.W.2d 923 (1960).

Because this matter has been expedited through the cooperation of the parties and the district court, we have treated this petition for the writ of quo warranto as if it had been filed in the first instance in the district court.

On November 2, 1982, the voters of the State of Minnesota approved the following constitutional amendment:

> The legislature may authorize on-track parimutuel betting on horseracing in a manner prescribed by law.

Minn. Const. art. X, § 8. Pursuant to the constitutional authorization, the Minnesota Legislature in 1983 enacted Minn.Laws ch. 214, which created the Minnesota Racing Commission and detailed that body's licensing and regulatory powers over the establishment and operation of parimutuel betting on horseracing in Minnesota.[9] The commission was empowered to accept applications, and, in the exercise of its discretion, to issue licenses in one of four catego-

---

6. *See, e.g., State ex rel. Mattson v. Kiedrowski*, 391 N.W.2d 777 (Minn.1986); *State ex rel. Blee v. City of Rochester*, 260 Minn. 151, 109 N.W.2d 44 (1961).

7. *See, e.g., Latola v. Turk*, 310 Minn. 395, 247 N.W.2d 598 (1976).

8. *See, e.g., AFSCME Councils 6, 14, 65 and 96, AFL–CIO v. Sundquist*, 338 N.W.2d 560 (Minn. 1983).

9. In 1989 the legislature created a division of parimutuel racing in the Department of Gaming. 1989 Minn.Laws ch. 334, art. I, § 3 (codified at Minn.Stat. § 240.011, subd. 1 (1990)).

ries: the class A license for the ownership and operation of a racetrack with horseracing on which parimutuel betting is conducted (the only class A facility which has been licensed in Minnesota is Canterbury); the class B license for the sponsorship and management of horseracing on which parimutuel betting is conducted (Ladbroke is the current holder of the only class B license); the class C license for the privilege of engaging in certain occupations relating to horseracing; and the class D license for the conduct of parimutuel horseracing by county agricultural societies or associations (no class D license has ever been issued). Minn.Stat. § 240.05 (1990).

For purposes of the matter before the court, only a rudimentary understanding of parimutuel betting is necessary. Parimutuel betting is a system in which the total amount wagered is collected into a pool to be divided proportionately by the successful wagerers after designated sums including the "takeout" have first been subtracted.[10] While the wagering may become complicated by the employment of sophisticated betting strategies, the basic mechanics of the system and its payment formula are the same.

Since 1983, the exclusive method by which an individual in Minnesota could "place" a bet on a horserace has been by attendance in person at the only licensed racetrack, Canterbury; the individual makes direct payment of money constituting the wager to the sponsoring entity Ladbroke and simultaneously selects the race, the horse, and the predicted order of finish. The money "bet" is accepted at a terminal station located on the premises, operated either by the individual wagerer or a parimutuel clerk at a designated window. The prediction is then entered and recorded in the totalizator,[11] the computerized wagering management system, and a ticket memorializing the transaction is immediately generated and presented to the bettor. Any ticket which demonstrates a successful wager must normally be presented to Ladbroke at the Canterbury premises to claim the proportionate share of the winner's pool.

In 1991, the legislature created a fifth category of licensing authorizing the commission to issue not more than four class E licenses for teleracing facilities[12]—premises at which telerace simulcasting[13] is conducted. To acquire a class E license, the applicant must demonstrate that it already holds a valid class B license (in this state, Ladbroke is the only holder of a class B license) and that it conducts live racing at a class A facility. Minn.Stat. § 240.091, subd. 1 (Supp.1991). The 1991 legislation required that the facility be linked by computer to the racetrack and that the totalizator at the racetrack accept the computerized bet and print a ticket for the wagerer at the teleracing facility; any amount wagered is to become a part of the wagering pool as if the bet had been placed in person at the racetrack facility. See Minn.Stat. § 240.13, subds. 1 and 6 (Supp.1991).

At the same time it created the class E license, the legislature in 1991 for the first time defined the phrase "on-track pari-mutuel betting" to include not only "wagering conducted at a licensed racetrack," but also that conducted "at a class E licensed facility whose wagering system is electronically linked to a licensed racetrack." Minn.Stat. § 240.01, subd. 18 (Supp.1991). It is this

---

10. *See* Minn.Stat. § 240.01, subd. 5 (1990). Included in the designated sums to be subtracted from the pool before it is divided by the "winners" are taxes, amounts committed to the state breeders' fund, the payment to the entity sponsoring the event and the purses to the successful horse owners. The net pool is then divided proportionately, *i.e.,* in accordance with one's proportionate contribution to the pool.

11. The totalizator receives information from the terminals regarding the amounts and types of wagers placed in each race and continuously computes and recomputes the amount of each pool, the odds of winning and the pay out at the time computed. The information is displayed as it is first generated and as it is updated.

12. Minn.Stat. §§ 240.05, subd. 1(e) and 240.091, subd. 1 (Supp.1991).

13. "Simulcasting" is the "televised display, for pari-mutuel wagering purposes, of one or more horse races conducted at another location" at the same time as the actual race occurs. Minn. Stat. § 240.01, subd. 19 (Supp.1991).

expansive definition and the coordinate authority accorded the racing commission which forms the first basis of the petitioner's challenge.

The second basis of this challenge relates to the 1985 promulgation by the Minnesota Racing Commission of rules designing and implementing a telephone account wagering system [14] in Minnesota. *See* Minn.R. 7873.0400, subp. 3A (1987).[15] Explained simply, the telephone account wagering system requires the maintenance by account holders of a minimum balance account against which wagers are debited and "winnings" are credited without the actual physical payment of monies. An account holder merely telephones a licensed employee at the racetrack, provides account information, authorizes, and instructs the employee to place and record the wager on the account holder's behalf. The conversations and transactions are recorded, with recordings retained for a minimum of 90 days to allow inspection on inquiry by the commission. As with in-person racetrack wagering and remote teleracing facility wagering, any amounts wagered are automatically included in the appropriate pool for proportional distribution to ultimate winners. The apparent distinction of this wagering method is that no ticket is generated by the facility or presented to the wagerer and, instead, the transaction is only electronically recorded and finalized. Moreover, the wagerer need not be present at the racetrack or a teleracing facility—all that is required is access to a telephone. Ladbroke was the first and, to date, the only entity to obtain approval from the commission to conduct telephone account wagering, but as of the time of these proceedings, had not implemented the system.

The substantive scope of our inquiry narrows considerably to the question of whether Minn. Const. art. X, § 8 contemplates other than on-track, *i.e.,* on the racetrack premises, parimutuel betting. We hold that it does not.

The parties stipulated to a number of facts and a recitation of the considerable historical background to the framing of the amendment question posed to the voters, to the 1983 legislation, to the 1991 legislation, and to the administrative rules promulgated by the racing commission. They did not agree to definitions of the phrases "on-track" and "off-track" betting. However, that inability to agree upon an accepted meaning of the terms is not only expected given the nature of this controversy, but also of little consequence given the ordinary, usual meanings commonly attached to the phrases.

While we are not bound by definitions adopted in the Interstate Horseracing Act of 1978, 15 U.S.C. §§ 3001–3007 (Supp. II 1978), we find them not only instructive, but also supportive of our own common understanding. Those definitions are as follows:

(4) "on-track wager" means a wager with respect to the outcome of a horserace which is placed at the racetrack at which such horserace takes place;

* * * * * *

(7) "off-track betting system" means any group which is in the business of accepting wagers on horseraces at locations other than the place where the horserace is run, which business is conducted by the State or licensed or otherwise permitted by state law.

15 U.S.C. § 3002 (1988).

On the numerous occasions we have been required to examine constitutional

---

**14.** The commission was first specifically authorized to promulgate rules governing the operation of teleracing facilities in Minn.Stat. § 240.-23(j) (Supp.1991), but promulgated rules for telephone account wagering in apparent accordance with its general rulemaking authority pursuant to Minn.Stat. § 240.23 (Supp.1983).

**15.** Minn.R. 7873.0400, subp. 3A (1987) provides as follows:

A. A person desiring to open a telephone wagering account must:

(1) be 18 years old or older and provide proof of identification and age;

(2) deposit with the association no less than $100 in cash or by certified check or money order; and

(3) obtain a code number and code name assigned by the association.

provisions, we have repeatedly observed that it is our task to give effect to the clear, explicit, unambiguous and ordinary meaning of the language. *State ex rel. Gardner v. Holm,* 241 Minn. 125, 62 N.W.2d 52, 55 (1954). If the language of the provision is unambiguous, it must be given its literal meaning—there is neither the opportunity nor the responsibility to engage in creative construction. *See, e.g., Village of McKinley v. Waldor,* 284 Minn. 394, 399, 170 N.W.2d 430, 433 (1969) (citations omitted). The rules limiting our construction have not changed since we enunciated them in *State ex rel. Chase v. Babcock,* 175 Minn. 103, 107, 220 N.W. 408, 410 (1928):

> The rules governing the courts in construing articles of the State Constitution are well settled. The primary purpose of the courts is to ascertain and give effect to the intention of the Legislature and people in adopting the article in question. If the language used is unambiguous, it must be taken as it reads, and in that case there is no room for construction. The entire article is to be construed as a whole, and receive a practical, common sense construction. It should be construed in the light of the social, economic, and political situation of the people at the time of its adoption, as well as subsequent changes in such conditions.

In its literal sense, the word "on" as a part of the phrase "on-track" is more precisely defined as "at" to denote a location for the placement of a parimutuel bet. Because the voters of the State of Minnesota specifically approved the only question posed to them with regard to "on-track parimutuel betting on horseracing," we are compelled to give the phrase that narrow but literal and unambiguous meaning. As a practical matter then, bets not physically placed at the racetrack cannot be, by definition, "on-track," no matter how they are transmitted to the track, electronically recorded or accepted into the pool of funds.

This interpretation of the literal meaning of the singular constitutional provision is consistent with the legislature's own view of its mandate in 1983 when, in legislation enacted in the session immediately following the voters' approval of the amendment,[16] the legislature specifically prohibited what it designated as "Off–Track Bets"[17] and, in separate legislation, acknowledged a distinction between "money bet on the premises" and that bet "off the premises."[18] While such a recognition is

---

**16.** *Jude v. Erdahl,* 296 Minn. 200, 206, 207 N.W.2d 715, 719 (1973) (legislation immediately following a constitutional amendment is indicative of voter and legislative intent).

**17.** In addition, the following acts are prohibited:
OFF–TRACK BETS. No person may, as part of an organized commercial activity, place or accept a bet off the premises of a licensed racetrack for delivery to a licensed racetrack.
1983 Minn.Laws, ch. 214, § 25, subd. 2 (codified at Minn.Stat. § 240.25, subd. 2 (Supp.1983)).
While section 240.25 has been amended on several occasions during the sessions between 1983 and 1991, the prohibition essentially remained the same, that against the receipt or delivery of anything of value "outside of the enclosure of a licensed racetrack * * *, to be placed as wagers in the pari-mutuel system of wagering on horse racing within the enclosure." Minn.Stat. § 240.25, subd. 2(1) (1990).
It was only at the time of the comprehensive expansion of the parimutuel system that the legislature altered the substance of the prohibition. Section 240.25, subd. 2(a)(1) now prohibits receipt or delivery of anything of value "outside of the enclosure of a licensed racetrack

* * * or a teleracing facility, to be placed as wagers in the pari-mutuel system of wagering on horse racing within the enclosure *or facility.*" Minn.Stat. § 240.25, subd. 2(a)(1) (Supp.1991) (emphasis added). Moreover, it specifically excepted parimutuel wagering at a licensed teleracing facility from the scope of the prohibition. Minn.Stat. § 240.25, subd. 2(b) (Supp.1991).

**18.** In this 1983 legislation, horse races run in other states could be televised on racetrack premises, but limits were placed on the parimutuel pool. The pertinent provision is as follows:
> The commission may by rule permit a class B or class D licensee to conduct on the premises of the licensed racetrack pari-mutuel betting on horse races run in other states and broadcast by television on the premises. All provisions of law governing pari-mutuel betting apply to pari-mutuel betting on televised races except as otherwise provided in this subdivision or in the commission's rules. *Pari-mutuel pools conducted on such televised races may consist only of money bet on the premises and may not be commingled with any other pool off the premises * * *.*
1983 Minn.Laws ch. 214, § 13, subd. 6 (emphasis added).

unnecessary to our decision, it is nevertheless pertinent to our inquiry to the extent it demonstrates the general understanding of the language of the provision. If the legislature so understood its mandate, it may be presumed that so also did the citizenry in approving the narrowly drafted proposed amendment.

Thus, we conclude that, in application of the narrow principle of constitutional construction and our view that provisions in state constitutions are expressions of limitations on the powers of government,[19] the language of limitation in this constitutional provision, while not expressly prohibiting off-track betting, only empowered the legislature to enact legislation governing betting on or at the racetrack premises. Wagering at facilities remote from the racetrack or by telephonic means are beyond the scope of the activities authorized by the voters and are therefore impermissible. The respondents have urged our consideration of extrinsic factors including the remarkable advances in technology which facilitate remote wagering from specified locations throughout the state and the change in the economic climate since 1982, carrying with it the spur of competitive gambling alternatives. However, we cannot ignore our own mandate—to refrain from expansive interpretation by looking beyond the clear, unambiguous and ordinary meaning of the language of the constitutional provision.

Writ of quo warranto shall issue to the Minnesota Racing Commission.

YETKA, J., took no part.

---

19. *See State ex rel. Mattson v. Kiedrowski,* 391 N.W.2d 777, 782–83 (Minn.1986).