STATE OF NEBRASKA EX REL. DON STENBERG, ATTORNEY GENERAL
OF THE STATE OF NEBRAKA, RELATOR, V. OMAHA EXPOSITION
AND RACING, INC., A NEBRASKA NONPROFIT
CORPORATION, ET AL., RESPONDENTS.

644 N.W.2d 563

Filed May 31, 2002.   No. S-01-973.

Don Stenberg, Attorney General, and L. Jay Bartel for relator.

Michael J. Lehan and Michael A. Kelley, of Kelley & Lehan, P.C., for respondents.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## NATURE OF CASE

In this original action, the Attorney General (relator) asks the court to declare (1) that the conduct of "telephonic wagering" pursuant to Neb. Rev. Stat. §§ 2-1230 to 2-1242 (Reissue 1997) violates Neb. Const. art. III, § 24, and (2) that licenses to conduct telephonic wagering are void due to the unconstitutionality of the statutes under which they were issued. The relator also seeks to permanently enjoin the respondents from acting pursuant to licenses granted by the Nebraska State Racing Commission (Commission).

## SCOPE OF REVIEW

■ The burden of establishing the unconstitutionality of a statute is on the one attacking its validity. *Bergan Mercy Health Sys. v. Haven*, 260 Neb. 846, 620 N.W.2d 339 (2000).

■ Statutes are afforded a presumption of constitutionality, and the unconstitutionality of a statute must be clearly established before it will be declared void. *Id.*

## FACTS

The respondents are entities licensed by the Commission to conduct parimutuel wagering on live horseracing and on horseracing events conducted both within and outside the state, including simulcast wagering. Named as respondents are Omaha Exposition and Racing, Inc., which operates Horsemen's Park Racetrack in Omaha; the Nebraska State Board of Agriculture, which operates State Fair Park Racetrack in Lincoln; the Hall County Livestock Improvement Association, which operates Fonner Park Racetrack in Grand Island; the Platte County Agricultural Society, which operates Columbus Agricultural Park Racetrack in Columbus; and South Sioux City Exposition and Racing, Inc., which operates Atokad Downs Racetrack in South Sioux City. In May 2001, the Commission, acting pursuant to §§ 2-1232 and 2-1241, approved licenses for the respondents which allow them to conduct telephonic wagering at the respective racetracks. Omaha Exposition and Racing,

Inc., began operating telephonic wagering pursuant to its license on October 24.

The relator asserts that a portion of 1992 Neb. Laws, L.B. 718, now codified at §§ 2-1230 to 2-1242, violates article III, § 24, which states in pertinent part:

> Nothing in this section shall be construed to prohibit (a) the enactment of laws providing for the licensing and regulation of wagering on the results of horseraces, wherever run, either within or outside of the state, by the parimutuel method, when such wagering is conducted by licensees within a licensed racetrack enclosure . . . .

Sections 2-1230 to 2-1242 purport to authorize telephonic wagering which does not occur within the confines of a licensed racetrack enclosure in the state.

In Nebraska, betting on the outcome of horseraces is authorized when conducted by the parimutuel method. Bettors attempt to predict the outcome of one or more races. All wagers on any of the horses to win in a specific race constitute a pool. After deductions for taxes, for promotion of agriculture and breeder's awards, and for payment to the entity conducting the races, the amount remaining in the pool is paid out to the bettors in proportion to their bets, e.g., the winner who has wagered $20 receives 10 times as much as the winner who wagered $2. A combination of the total amount bet by all bettors and the total amount bet upon the same successful horse or combination of horses determines the amount won. A separate pool is used to collect more complicated bets, such as predicting the exact order of finish of horses in a race or of the winners in two or more races. That pool is divided among the successful bettors.

A computer known as a totalizator is used to manage the wagers. The computer continuously computes and recomputes the amount of each pool, the amount bet upon each prediction for each horse, and the amount that would theoretically be paid out for each $2 bet on each horse if the race is finished and that horse wins, places, or shows.

According to the parties, when telephonic wagering is not available, an individual who wishes to place a bet on a horserace is required to go to a licensed racetrack; select the race, the horse, and the order of finish; and then place the bet at a terminal station,

which is either operated by the bettor or a parimutuel clerk at a parimutuel window. When the bet is entered into the totalizator, a ticket showing the transaction is issued and given to the bettor. If the bettor is successful, the ticket is presented to the racetrack for payment.

As a result of the Commission's issuance of licenses for telephonic wagering, a person outside the confines of a licensed racetrack enclosure may place a telephone call to a racetrack and give instructions to an employee of the racetrack concerning the wager of money that the individual has on deposit at a telephone deposit center in his or her own deposit account. After the racetrack employee at the telephone deposit center has received a call and determined that the individual has sufficient funds in the deposit account, the employee places the wager on behalf of the caller. The wager is entered into the totalizator, which records the transaction and places the money in the applicable parimutuel pool. Any winnings are credited to the individual's deposit account, and any losses are deducted from the account. The employee is allowed to enter a wager only if the individual has sufficient funds available in the deposit account at the time the wager is placed by the employee.

## ISSUES BEFORE COURT

The court is asked to determine (1) whether the authorization of telephonic wagering on horseraces pursuant to §§ 2-1230 to 2-1242 violates article III, § 24, which authorizes parimutuel wagering on the results of horseraces within or outside the state only "when such wagering is conducted by licensees within a licensed racetrack enclosure"; (2) whether licenses issued by the Commission authorizing the respondents to conduct telephonic wagering are void due to the unconstitutionality of the statutes under which they were issued; and (3) whether the respondents should be permanently enjoined from acting pursuant to the telephonic wagering licenses issued by the Commission.

## ANALYSIS

### L.B. 718

The statutes in question were passed by the Legislature as 1992 Neb. Laws, L.B. 718. The Legislature stated that "horseracing, horse breeding, and parimutuel wagering industries are important

sectors of the agricultural economy of the state, provide substantial revenue for state and local governments, and employ many residents of the state." § 2-1230(1)(a). Teleracing facilities provide a potential for strengthening the horseracing industry and its economic contributions to the state. § 2-1230(1)(b). The Legislature found that "it is in the best interests of the state to encourage experimentation with parimutuel wagering through licensed teleracing facilities" and telephonic wagering. § 2-1230(1)(b) and (c). The experimentation would determine whether teleracing and telephonic wagering would promote growth of the horseracing industry and provide additional revenue to the state. § 2-1230(1)(d). The Legislature also found that teleracing and telephonic wagering should be authorized and regulated so that it would not jeopardize horseracing or employment opportunities. § 2-1230(1)(e).

Telephonic wagering is defined as "the placing of parimutuel wagers by telephone to a telephone deposit center at a licensed racetrack as authorized by the commission." § 2-1231(5). A teleracing facility is "a detached, licensed area occupied solely by a licensee for the purpose of conducting telewagering and containing one or more betting terminals, which facility is either owned or under the exclusive control of the licensee during the period for which it is licensed." § 2-1231(6). Telewagering is "the placing of a wager through betting terminals electronically linked to a licensed racetrack, which . . . instantaneously transmits the wagering information to the parimutuel pool for acceptance and issues tickets as evidence of such wager." § 2-1231(7).

At the present time, the Commission issues licenses to racetracks for the operation of telephonic wagering facilities. § 2-1232. A licensee may deduct up to 5 percent from the winnings of any winning ticket purchased through telephonic wagering. § 2-1236. A licensed racetrack that conducts live races may establish a telephonic wagering system if the racetrack establishes and maintains a telephone deposit center. All wagers must be entered into the parimutuel pool and are subject to all laws and conditions applicable to any other wagers. § 2-1239.

Under the law, only the holder of the deposit account may place a telephonic wager. § 2-1240. Any violation of that rule constitutes a Class II misdemeanor. *Id.* Telephonic wagering is allowed at licensed racetracks which conduct either intrastate

simulcasting or interstate simulcasting as approved by the Commission. § 2-1241. The racetracks must pay one-half of 1 percent of the amount wagered through telephonic wagering to the Department of Revenue for credit to the Commission's cash fund. § 2-1242.

CONSTITUTIONALITY OF L.B. 718

This court has previously been asked to consider the constitutionality of portions of L.B. 718. In 1994, upon an original action filed by the relator, we held that the provisions of L.B. 718 which authorized teleracing facilities to conduct telewagering were unconstitutional in violation of article III, § 24. See *State ex rel. Stenberg v. Douglas Racing Corp.*, 246 Neb. 901, 524 N.W.2d 61 (1994).

Douglas Racing Corp. was licensed to operate a teleracing facility in Bennington, Nebraska, at which terminals were electronically linked to its totalizator located in Omaha. The bets were entered by either the bettor or the parimutuel clerk and then sent to the totalizator at the racetrack. The bettors received tickets as evidence of their wagers. We held that the relator had met the burden to establish that certain statutes were unconstitutional to the extent they authorized telewagering.

In *Douglas Racing Corp.*, the relator argued that telewagering at a teleracing facility was unconstitutional because parimutuel wagering on horseraces must be conducted within a licensed racetrack enclosure and that telewagering was equivalent to off-track betting, which was not constitutionally authorized. The respondent unsuccessfully asserted that because the licensee conducted his end of the wagering within the confines of the licensed racetrack, telewagering was constitutional.

We concluded that article III, § 24, was unambiguous and required no construction. *State ex rel. Stenberg v. Douglas Racing Corp., supra*, citing *State ex rel. Spire v. Conway*, 238 Neb. 766, 472 N.W.2d 403 (1991). The Constitution's provision that parimutuel wagering is authorized only when conducted within a licensed racetrack enclosure "plainly requires that (1) the wagering must be conducted by an entity licensed to do so and (2) the wagering must be conducted by licensees at a racetrack enclosure which is licensed to operate horseraces." *Douglas Racing Corp.*,

246 Neb. at 906, 524 N.W.2d at 64. Wagering which takes place outside a licensed racetrack enclosure or a detached facility "cannot logically occur within a licensed racetrack enclosure as required by our Constitution." *Id.* We determined that telewagering at teleracing facilities was the functional equivalent of off-track betting, which was not conducted within a licensed racetrack enclosure and which violated the state Constitution. *Id.*

We held that Douglas Racing Corp.'s license for the operation of the Bennington facility was void because it was licensed pursuant to an unconstitutional statute. We enjoined the respondent from acting pursuant to the license issued by the Commission. While we held that Neb. Rev. Stat. §§ 2-1203, 2-1203.01, 2-1207, 2-1208, 2-1216, 2-1221, 2-1222, and 2-1230 through 2-1242 (Cum. Supp. 1994) were all unconstitutional to the extent they authorized telewagering at teleracing facilities, we did not address any other portions of L.B. 718.

Here, we are asked to consider the remainder of L.B. 718 as it purports to authorize telephonic wagering. We first address whether the remainder of L.B. 718 is severable from the provisions previously held to be unconstitutional. Several factors must be considered in determining whether an unconstitutional provision is severable from the remainder of a statute:

> "(1) whether, absent the invalid portion, a workable plan remains; (2) whether the valid portions are independently enforceable; (3) whether the invalid portion was such an inducement to the valid parts that the valid parts would not have passed without the invalid part; (4) whether severance will do violence to the intent of the Legislature; and (5) whether a declaration of separability indicating that the Legislature would have enacted the bill absent the invalid portion is included in the act."

*Duggan v. Beermann,* 249 Neb. 411, 427-28, 544 N.W.2d 68, 78 (1996), quoting *Jaksha v. State,* 241 Neb. 106, 486 N.W.2d 858 (1992).

There is no dispute between the parties concerning the severability of L.B. 718. The relator suggests that although L.B. 718 did not include a severability clause, the provisions relating to telephonic wagering are severable because a workable plan remains even if telewagering is prohibited. The provisions related to

telephonic wagering are independently enforceable, and it does not appear that passage of telewagering was contingent upon or an inducement to enact the telephonic wagering portions. Experimentation with parimutuel wagering through both teleracing facilities and telephonic wagering was authorized in § 2-1230(2). The relator asserts that the holding in *State ex rel. Stenberg v. Douglas Racing Corp.*, 246 Neb. 901, 524 N.W.2d 61 (1994), does not preclude severing the invalid provisions concerning telewagering from the provisions concerning telephonic wagering. Thus, we conclude that it is possible to sever the telewagering provisions from the telephonic wagering provisions.

■ We next examine whether telephonic wagering is unconstitutional. The burden of establishing the unconstitutionality of a statute is on the one attacking its validity. *Bergan Mercy Health Sys. v. Haven*, 260 Neb. 846, 620 N.W.2d 339 (2000). Statutes are afforded a presumption of constitutionality, and the unconstitutionality of a statute must be clearly established before it will be declared void. *Id.* Constitutional provisions, like statutes, are not open to construction as a matter of course; construction of a constitutional provision is appropriate only when it has been demonstrated that the meaning of the provision is not clear and that construction is necessary. *State ex rel. Stenberg v. Douglas Racing Corp., supra.*

As noted earlier, article III, § 24, does not prohibit wagering on horseracing by the parimutuel method "when such wagering is conducted by licensees *within a licensed racetrack enclosure.*" (Emphasis supplied.) The key issue here is whether telephonic wagering occurs within a licensed racetrack enclosure.

Section 2-1231(5) defines telephonic wagering as "the placing of parimutuel wagers by telephone to a telephone deposit center at a licensed racetrack" as authorized by the Commission. For purposes of this opinion, the person placing the wager is not at the racetrack, but is calling from a telephone away from the facility. The parties stipulated that "a person located outside the confines of a racetrack will be allowed to place a call to a licensed racetrack enclosure to give instructions to an employee of the racetrack concerning the wager of money that the individual has on deposit at a telephone deposit center."

In attempting to allow different forms of parimutuel wagering, the Legislature stated that "[w]agers placed . . . by approved telephonic wagering as authorized by sections 2-1230 to 2-1242 shall be deemed to be wagers placed and accepted within the enclosure of any racetrack." See § 2-1207 (Reissue 1997). However, as the relator notes, the Legislature may not circumvent or nullify the constitution by defining terms in statutes. In *MAPCO Ammonia Pipeline v. State Bd. of Equal.*, 238 Neb. 565, 571, 471 N.W.2d 734, 739 (1991), *cert. denied* 508 U.S. 960, 113 S. Ct. 2930, 124 L. Ed. 2d 681 (1993), we held that the Legislature's "power to define [terms] is limited, since (1) the Legislature cannot abrogate or contradict an express constitutional provision and (2) the legislative definition must be reasonable, and cannot be arbitrary or unfounded."

Pursuant to stipulation, under telephonic wagering, the person making the wager calls the licensed racetrack directly to instruct an employee on the placing of a wager. Thus, it is undisputed that the person placing the call is outside the licensed racetrack enclosure.

Nebraska's Constitution is not a grant, but, rather, is a restriction on legislative power, and the Legislature is free to act on any subject not inhibited by the constitution. *State ex rel. Stenberg v. Douglas Racing Corp.*, 246 Neb. 901, 524 N.W.2d 61 (1994). The question is whether the wager is placed within the licensed racetrack enclosure when the telephone call is initiated outside the racetrack enclosure. Simply stated, does the constitution require that the person making the call to the licensee also be located within the licensed racetrack enclosure?

The respondents argue that the constitution requires only that the licensee's activity in conducting wagering on horseraces occur within a licensed racetrack enclosure. This is distinguished from wagers made at a teleracing facility, where at least a part of the licensee's activity occurs outside the racetrack enclosure. They assert that the wager occurs within the confines of the racetrack enclosure because the wager is placed by a racetrack employee pursuant to instructions from a person outside the enclosure. They conclude that it is only the actions of the licensee's employee that constitute the placing of the wager.

The respondents argue that telephonic wagering is substantially different from telewagering. They assert that the only action taken by a person who is outside the racetrack enclosure is to give instructions to an employee of the licensed racetrack, who then places the wager from within the enclosure. In their brief, they claim that telephonic wagering is conducted every day by persons who go to the racetrack with a cellular telephone and place wagers for friends who are located outside the racetrack enclosure. They argue that the wager occurs only when the person inside the racetrack enclosure places the wager with the licensee.

The relator argues that both telephonic wagering and telewagering involve the same conduct—placing wagers on horseraces from an offtrack location. The relator claims that it is the caller who directs the racetrack employee to follow his instructions and that, therefore, it is the offtrack caller who is engaged in wagering on the horserace.

Minnesota has faced a similar challenge to its constitution, which was amended in 1982 to provide that " '[t]he legislature may authorize on-track parimutuel betting on horseracing in a manner prescribed by law.' " *Rice v. Connolly*, 488 N.W.2d 241, 244 (Minn. 1992). In 1985, the Minnesota Racing Commission adopted rules implementing a telephone account wagering system, in which account holders maintained a minimum balance against which wagers were debited and winnings were credited. The account holder telephoned a licensed employee at a racetrack to place and record wagers on behalf of the account holder. "[T]he wagerer need not be present at the racetrack or a teleracing facility—all that is required is access to a telephone." *Id.* at 246.

When asked whether the constitution "contemplate[d] other than on-track, *i.e.*, on the racetrack premises, parimutuel betting," the Minnesota Supreme Court found that it did not. See *id.* The court found that "[i]n its literal sense, the word 'on' as a part of the phrase 'on-track' is more precisely defined as 'at' to denote a location for the placement of a parimutuel bet." *Id.* at 247. The state's voters had specifically approved " 'on-track parimutuel betting on horseracing,' " and the court found, as a practical matter, that "bets not physically placed at the racetrack cannot be, by definition, 'on-track,' no matter how they are

transmitted to the track, electronically recorded or accepted into the pool of funds." *Id.*

The Minnesota court noted, as the respondents had pointed out, that advances in technology facilitated remote wagering. However, the court found that its own mandate required it to "refrain from expansive interpretation by looking beyond the clear, unambiguous and ordinary meaning of the language of the constitutional provision." *Id.* at 248. It held: "Wagering at facilities remote from the racetrack or by telephonic means are beyond the scope of the activities authorized by the voters and are therefore impermissible." *Id.*

Following the rationale of the Minnesota Supreme Court, resolution of the case at bar is relatively simple. In the context of telephonic wagering, wagers are not placed by a licensee until the licensee has been instructed to do so by a caller, and the instructions do not originate from within a licensed racetrack enclosure. We conclude the constitution requires that the instructions to place the wager must originate from within the licensed racetrack enclosure.

Nebraska voters have previously rejected an attempt by the Legislature to change the constitutional provisions concerning parimutuel betting. In 1995, the Legislature adopted L.R. 24CA, which placed before the voters a constitutional amendment proposing the elimination of the location requirement in article III, § 24. The amendment provided that parimutuel wagering on racehorses could be conducted by licensees "at such locations and by such means as are authorized by the Legislature." The introducer's statement of intent noted this court's decision in *State ex rel. Stenberg v. Douglas Racing Corp.*, 246 Neb. 901, 524 N.W.2d 61 (1994), and stated that L.R. 24CA would delete the location provision and provide the Legislature with the authority to determine the location and means of wagering on horseraces. See Statement of Intent, L.R. 24CA, General Affairs Committee, 93d Leg., 2d Sess. (Jan. 23, 1995). At the general election in November 1996, the constitutional amendment was defeated by a vote of 388,462 against and 236,600 in favor.

Nebraska's Constitution permits wagers on horseracing when the "wagering is conducted by licensees within a licensed racetrack enclosure." See Neb. Const. art. III, § 24. As this court held

in *Douglas Racing Corp.*, the constitutional language allows wagering only by those who are within a racetrack enclosure. Telephonic wagering differs from telewagering only as to the form used to transmit the wager. It is a distinction without a difference. Telephonic wagering violates the constitution because it does not occur within a licensed racetrack enclosure. The relator has met the burden of establishing that the telephonic wagering statutes are unconstitutional.

## CONCLUSION

▮ We have held that "[a]n unconstitutional statute is a nullity, is void from its enactment, and is incapable of creating any rights or obligations." *Douglas Racing Corp.*, 246 Neb. at 906, 524 N.W.2d at 65. The statutes purporting to authorize telephonic wagering, §§ 2-1230 to 2-1242, are unconstitutional. The licenses issued to the respondents to conduct telephonic wagering are void because they were issued pursuant to these statutes. The respondents are permanently enjoined from acting pursuant to the licenses issued by the Commission, and judgment is entered for the relator.

JUDGMENT FOR RELATOR.