Stanley **HUNKINS,** individually and d/b/a Muse Ten Center, et al., Appellants,

v.

## CITY OF MINNEAPOLIS,

The Minneapolis Community Development Agency,

Minnesota Technology Corridor Corporation, Respondents.

No. CX–93–1009.

Court of Appeals of Minnesota.

Nov. 23, 1993.

Review Denied Jan. 27, 1994.

Lawrence H. Crosby, Clem & Crosby, Minneapolis, for Stanley Hunkins.

Robert J. Alfton, Minneapolis City Atty., Michael T. Norton, Asst. City Atty., Minneapolis, for City of Minneapolis.

James R. Dorsey, Marc D. Simpson, Leonard, Street & Deinard, Minneapolis, for Minneapolis Community Development Agency.

Corey J. Ayling, Eileen A. Beckett, McGrann, Shea, Franzen, Carnival, Straughn & Lamb, Chartered, for Minnesota Technology Corridor Corp.

Considered and decided by RANDALL, P.J., and KALITOWSKI and DAVIES, JJ.

## OPINION

DAVIES, Judge.

In this inverse condemnation action, Stanley Hunkins appeals from the district court's grant of summary judgment to respondents City of Minneapolis, Minneapolis Community Development Agency, and Minnesota Technology Corridor Corporation. The district court found that, because Hunkins had failed to obtain a final determination from the City's zoning board, he could not establish that the zoning regulation would have an economic impact on his property. The court, therefore, refused to reach the merits of Hunkins' inverse condemnation claim. We affirm.

## FACTS

In 1983, Hunkins purchased two parcels of land in the Industry Square Development area of Minneapolis. He contemplated renovating two existing buildings into a "business incubator" office complex where fledgling companies could lease office space and have access to on-site support services. Hunkins called his complex the "Muse Ten."

At the same time, the City commissioned a task force to recommend plans for a comprehensive, revitalization project in the Industry Square area, to be known as the "Technology Corridor." Hunkins' property occupied a portion of the Technology Corridor.

The City did not adopt the task force's recommendation report until February 1985. By that time, the Muse Ten complex had opened its doors. A year later, in response to concerns about protecting the area's development scheme, the City approved a 12–month building permit moratorium so that it could study possible rezoning. The City later extended the moratorium into mid–1987. The City allowed Hunkins to continue renovation of his property during the moratorium, however, and even issued him a building permit.

Before any rezoning occurred, the City asked the Minnesota Technology Corridor Corporation ("MTCC") and Minneapolis Community Development Agency ("MCDA") to assist in the development of the Technology Corridor. The MTCC/MCDA's report emerged in December 1986 and proposed using a single developer and recommended rezoning the area.

In December 1986, the City adopted zoning ordinances consistent with the Technology Corridor's zoning requirements, establishing two distinct zones: (1) the "T" zone, allowing technology intensive uses only; and (2) the "TC" zone, allowing commercial uses supportive of technology intensive uses. Hunkins' Muse Ten property fell within the "TC" zone. The City viewed the businesses then operating in the Muse Ten complex as legal nonconforming uses and set up a special procedure for owners of those properties to apply for zoning determinations.

Before the City enacted the zoning ordinances, Hunkins began experiencing financial difficulties. In April 1987, a judgment for unpaid property taxes was entered against Hunkins. Several months later, Hunkins' lender withdrew its financial backing. Now he claims the lender withdrew in part because of the proposed zoning changes. Although he registered his objections with a variety of city personnel, Hunkins never requested a variance or special use permit from

the City. Nor did he ever seek to enjoin the enactment or enforcement of the ordinances.

In April 1991, the Muse Ten property forfeited to the state for nonpayment of 1986 property taxes.

## ISSUE

May a district court refuse to decide a property owner's takings claim where the owner has not sought a final determination regarding application of the zoning to the property?

## ANALYSIS

On appeal from a summary judgment, this court must determine (1) whether there are any genuine issues of material fact and (2) whether the district court erred in its application of the law. *Offerdahl v. University of Minn. Hosps. & Clinics,* 426 N.W.2d 425, 427 (Minn.1988).

At trial, no one disputed that Hunkins had failed to obtain a final determination as to the effect of the zoning on his property. In finding that Hunkins' inaction was fatal to his takings claim, the district court correctly ruled that Hunkins' claim was premature. Whether a zoning regulation has gone too far cannot be measured

> until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question.

*Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 191, 105 S.Ct. 3108, 3119, 87 L.Ed.2d 126 (1985). The United States Supreme Court has clearly established this finality requirement, noting that the Court's cases

> "uniformly reflect an insistence on knowing the nature and extent of permitted development before adjudicating the constitutionality of the regulations that purport to limit it."

*Lucas v. South Carolina Coastal Council,* —— U.S. ——, ——, 112 S.Ct. 2886, 2891, 120 L.Ed.2d 798 (1992) (quoting *MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 351, 106 S.Ct. 2561, 2567, 91 L.Ed.2d 285 (1986)).

This court has also dealt with the finality requirement. Citing *Williamson* and *MacDonald,* this court found that

> [e]conomic impact and interference with expectation interests cannot be evaluated until after a final application of the regulations to the land in question.

*Thompson v. City of Red Wing,* 455 N.W.2d 512, 516 (Minn.App.1990), *pet. for rev. denied* (Minn. June 26, 1990).

In addition, a "takings claim is not ripe when the landowners have not submitted a development plan." *Thompson,* 455 N.W.2d at 516 (citing *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980)). Moreover, a landowner's takings claim is not ripe even "where only one plan is rejected and no other plan is proposed." *Id.* (citing *Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 136–37, 98 S.Ct. 2646, 2665–66, 57 L.Ed.2d 631 (1978)).

Now, six years after the City enacted the zoning ordinances and two years after the property forfeited to the state, Hunkins attempts to draw a causal link between the zoning restrictions and the demise of his development. He contends that the City's actions, in conjunction with the MCDA and the MTCC, constituted a final determination and that requesting a variance or special use permit would have been futile. As authority for this defense, Hunkins cites the Minnesota Supreme Court's holding that "administrative remedies need not be pursued if it would be futile to do so." *McShane v. City of Faribault,* 292 N.W.2d 253, 256 (Minn.1980).

But Hunkins' reliance on *McShane* is misplaced. There, the supreme court ruled that the McShanes were not first required to exhaust their administrative remedies by requesting a variance or a permit because under their particular circumstances, "a variance would neither be adequate nor appropriate relief." *Id.* Unlike Hunkins, the McShanes wanted to sell their property, rather than to develop it. *Id.* Therefore, they had no development plan

> upon which to base a request for a variance. * * * [A]ction on a request for a variance would have to wait until [the

McShanes] could sell their property to a buyer with specific plans for it, and the marketability of the property would almost certainly be decreased because of the uncertainty. As a result, [the McShanes] are affected to their detriment by the zoning regulations even if a variance ultimately is granted.

*Id.* The supreme court also questioned the propriety of a variance for the McShanes allowing commercial use of the property upon its sale, noting that a variance "would be virtually impossible * * * without undermining the safety goals of the [airport zoning] regulations." *Id.*

 In this case, such considerations do not play a role. More importantly, as developer of the property, Hunkins might easily have submitted development plans upon which the zoning board could have reached a final determination. But Hunkins never tested the City's commitment to its zoning regulations. Although he now contends the city "knew" the scope of his development plans, the law is clear that an actual plan must be submitted. *Thompson,* 455 N.W.2d at 516; *see also McShane,* 292 N.W.2d at 256 (zoning board needs "to consider specific plans"). Moreover, the record reflects that the City granted a variance to a property owner operating a liquor store within the Technology Corridor; it might have done the same for Hunkins had he submitted a plan showing that his contemplated use of the property was compatible with the City's plan.[1]

 We agree, therefore, with the district court's holding that

> merely because plaintiffs feel they have been ignored and the zoning decision ran adverse to their stated desires * * * does not mean that seeking a final determination or a variance [was] futile.

---

1. The district court noted that where a government acts as an enterpriser, a compensable taking occurs if the property owner demonstrates that the government's regulation has caused a substantial diminution in the property's market value. Where a government acts as an arbitrator, a compensable taking occurs only if the government's decision results in the landowner losing all reasonable use of the property. *Thompson v. City of Red Wing,* 455 N.W.2d 512,

We further note that the purpose of the finality requirement is to force the decisionmaker to arrive at "a definitive position on the issue that inflicts an actual, concrete injury." *Williamson,* 473 U.S. at 193, 105 S.Ct. at 3120.

## DECISION

That Hunkins never obtained a final determination was ·undisputed. Therefore, the district court properly granted summary judgment.

**Affirmed.**

517 (Minn.App.1990) (citing *McShane v. City of Faribault,* 292 N.W.2d 253, 258–59 (Minn.1980)).

At trial and in this appeal, Hunkins correctly argued that, under these facts, the City acted in an enterprise capacity. Hunkins also contended that the City's down-zoning substantially diminished his property's market value. But neither of these contentions has any bearing on the district court's decision.