**Franklin KOTTSCHADE, Appellant,**

v.

**CITY OF ROCHESTER, Respondent.**

No. A08–0143.

Court of Appeals of Minnesota.

Feb. 10, 2009.

Timothy S. Hollister (pro hac vice), Shipman & Goodwin, L.L.P., Hartford, CT; and Gary A. Van Cleve, Rob A. Stefonowicz, Larkin, Hoffman, Daly & Lindgren, Bloomington, MN, for appellant.

Clifford M. Greene, Monte A. Mills, Greene Espel, P.L.L.P., Minneapolis, MN, for respondent.

Richard D. Snyder, Joseph G. Springer, Fredrikson & Byron, P.A., Minneapolis, MN, for amicus curiae.

Considered and decided by SHUMAKER, Presiding Judge; PETERSON, Judge; and STAUBER, Judge.

## OPINION

STAUBER, Judge.

On appeal from the district court's summary judgment that appellant-developer's

complaint alleging a regulatory taking by respondent-city was filed beyond the limitations period, appellant argues that (1) under the finality doctrine of *Williamson County Reg'l Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), and its progeny, appellant's complaint was timely because his claim was not ripe until after final administrative review of the denial of his variance application and (2) the record does not support the district court's determination that appellant's takings claim became moot. Because genuine issues of material fact exist and appellant's claim was ripe and not moot, we reverse and remand for further proceedings.

## FACTS

In 1992, appellant Franklin Kottschade acquired a 220–acre parcel of undeveloped property located on the southern edge of Rochester. In February 2000, appellant submitted a proposal, designated as General Development Plan (GDP) No. 151, to respondent City of Rochester (the city) for a development consisting of 104 townhome units.[1] The townhomes were to be located on a 16.44–acre tract within the 220–acre parcel. The proposal included rezoning to permit the construction of the townhomes.

Before submitting GDP 151, appellant, his design engineer, and his attorney met with city staff to discuss the project. City staff studied appellant's proposal and initially recommended approval of the project with eight conditions. Appellant claims he specifically inquired of city staff regarding the financial impact of the staff's conditions. He was told that costs could not yet be determined.

Following several public hearings, the planning-and-zoning commission recommended approval of appellant's rezoning request and GDP 151, subject to the eight conditions recommended by city staff. The city council discussed GDP 151 at public hearings on June 5 and 19, 2000.

At the June 19 hearing, appellant's counsel "entered a general objection to each and every one of the conditions of approval recommended by the Planning and Zoning Commission" and requested approval of GDP 151 "without the imposition of any conditions."

On July 5, 2000, the city council approved GDP 151 subject to the eight conditions initially proposed by city staff and adding the ninth condition recommended by staff at the public hearings in June. The conditions were:

A. The GDP should be revised to include the following:
- 50 feet of right-of-way shown as being dedicated for 40th Street S.W. and 11th Avenue S.W., consistent with the adopted Thoroughfare Plan;
- Pedestrian facilities along the east side of 11th Avenue S.W. and the south side of 40th Street S.W., consistent with the adopted Thoroughfare Plan;
- The site details (haul roads, stockpiles, proposed excavated ponds) of the approved conditional use permits covering this property and the adjacent properties;

B. Stormwater management must be provided for this development.

C. Controlled access must be provided along the entire length of 40th Street

---

**1.** The GDP is a plan or concept for development. Once approved by the city, city staff draft a "development agreement" which sets forth the details of the GDP plan. After the city provides "subsequent development approval," various permits are issued followed by actual construction.

S.W., with the exception of the private street access that is shown across from Willow Heights Drive S.W., and along 11th Avenue S.W., with the exception of the private roadway shown in the southwest corner of the GDP. The existing access immediately east of Willow Court S.W. must be closed upon construction of the private roadway.

D.  [Appellant] shall enter into a Development Agreement with the City that outlines the obligations of the applicant relating to, but not limited to, stormwater management, park dedication, traffic improvements, pedestrian facilities, right-of-way dedication, SAC and WAC fees and contributions for public infrastructure improvements and contributions for future reconstruction of 40th Street S.E. Current City policy for substandard street requires a contribution of $30.00 per foot of frontage for residential developments. The City may create a Transportation Improvement District in the area that may result in a capacity component being added to the substandard street reconstruction charge.

E.  If the development of this property occurs prior to the reconstruction of 40th Street S.W., grading of this property must be compatible with the street profile and cross-sections being proposed for the 40th Street S.W. reconstruction in the Street Layout Plan. The private roadway connections to public streets must meet City intersection sight line standards.

F.  [Appellant] agrees to dedicate a total of 50 feet of right-of-way from the centerline of 40th Street S.W. This dedication must be provided with the first plat of this development or when the City notifies the owner that a roadway improvement project is programmed, whichever comes first.

G.  [Appellant] must agree to meet the parkland dedication requirement for this development in the form of cash in lieu of land. The development has a parkland dedication requirement of approximately 1.76 acres based on a maximum density of six units/acres.

H.  A revised GDP shall be filed with the Planning Department reflecting all required modifications.

* * *

I.  The private roadway running parallel to 40th Street S.W., be relocated on the GDP outside of the proposed street profile and cross sections for 40th Street S.W., as indicated on the preliminary plans prepared for 40th Street S.W., as reflected in the street plan of the City of Rochester's current 6–year Capital Improvement Program.

The city's imposition of the conditions reduced the buildable area to 4.93 acres, and resulted in a site that could accommodate only 26 of the proposed 104 townhome units.

In September 2000, the city provided appellant with its draft development agreement. The draft agreement added a tenth condition, not included in the city's earlier decision, requiring appellant to dedicate two ponds to the city to create a 40–acre lake. The draft development agreement clarified several of the conditions, including costs for stormwater-management participation, sewer and water fees, future 40th street costs, developer infrastructure contributions, and roadway improvement charges. This was the first time that appellant was able to fully appreciate the economic impact of the now ten conditions on his development proposal. According to appellant, the cost and size limits of the conditions made his project

economically infeasible.[2] Appellant did not sign the development agreement.

Appellant applied to the city's zoning board of appeals (ZBA) for a waiver of the ten conditions. His variance application noted that "[t]he conditions placed on the development made the project economically unfeasible because of the cost impact of the conditions and the amount of land left available for development."

On October 4, 2000, the ZBA conducted a hearing. At the hearing, there was extensive discussion regarding the ZBA's perceived lack of jurisdiction to decide appellant's application. City staff and a representative of the City Attorney's office advised the ZBA that it did not have authority to overturn the city council on its issuance of a GDP. However, the ZBA heard the merits of appellant's appeal.

Appellant presented testimony, sworn affidavits, and a "before and after" scenario to show that the number of possible units was reduced from the proposed 104 to 26, that infrastructure costs rose by $2.3 million, the per-unit cost increased from $22,378 to $89,511, the city's projected traffic counts were inaccurate, and that the conditions made the project economically infeasible.

The ZBA denied appellant's application for lack of jurisdiction. Alternatively, the ZBA concluded on the merits that appellant presented insufficient evidence to support reversal of any of the ten conditions.

As provided by Rochester Code of Ordinances (R.C.O.) § 60.733, appellant appealed the ZBA's decision to the city council.

The appeal came before the city council on November 20, 2000. At that time, the council remanded the matter to the ZBA because the ZBA had failed to adopt findings of fact within the 21–day time frame required by R.C.O. § 60.414. On December 6, 2000, the ZBA again denied appellant's variance request, this time with specific findings. Following the ZBA's second denial, the city council held a public hearing on December 18th; the council heard and considered appellant's argument regarding the impact of the nine original conditions, the new ponding condition, and other requirements promulgated by staff in preparing the city's draft development agreement.

In an order dated January 3, 2001, the city council affirmed the ZBA's decision, finding on the merits that the evidence was insufficient to justify a variance to the conditions and that the ZBA "lacked the authority to vary the conditions of approval imposed upon a general development plan."

On May 7, 2001, appellant served the mayor with a demand that the city begin a condemnation action within ten days, asserting that the imposition of the conditions constituted an unconstitutional taking of property without just compensation. The mayor declined to do so.

In June 2001, appellant commenced a federal lawsuit seeking compensation for the alleged taking of his property without compensation. The federal district court dismissed the lawsuit for lack of subject-matter jurisdiction, holding that appel-

---

**2.** When appellant challenged the charges and conditions under the development agreement as excessive, he was, in effect, alleging an exaction theory. Cities rely on exactions to ensure that new developments pay a fair share of public costs. Exactions are fees used to fund public infrastructure directly connected to new development. As long as "the

degree of the exactions demanded by the permit conditions bears the required relationship to the projected impact of the proposed development" the exactions are appropriate and would not be considered a regulatory taking in violation of the Fifth Amendment. *Dolan v. City of Tigard*, 512 U.S. 374, 377, 114 S.Ct. 2309, 2312, 129 L.Ed.2d 304 (1994).

lant's claims were not ripe for adjudication because he had not first sued in state court. *Kottschade v. City of Rochester,* 2002 WL 91641, at *4 (D.Minn. Jan. 22, 2002). Appellant appealed to the Eighth Circuit Court of Appeals, which affirmed, holding that appellant "has not yet pursued a postdeprivation remedy in state court, as is required by *Williamson* and subsequent jurisprudence." *Kottschade v. City of Rochester,* 319 F.3d 1038, 1041 (8th Cir.2003), *cert. denied,* 540 U.S. 825, 124 S.Ct. 178, 157 L.Ed.2d 46 (2003).

On December 22, 2006, appellant filed this action in state district court alleging a claim under the Minnesota Constitution for inverse condemnation and a federal constitutional regulatory taking claim. The complaint sought an order requiring the city to commence condemnation proceedings under Minn.Stat. § 117.045 (2008), alleging that appellant's property had been taken for a public purpose and he was entitled to just compensation. Appellant also asserted that the conditions placed on the GDP amounted to a regulatory taking and a violation of his due process rights under the Fifth and Fourteenth amendments of the United States Constitution. Because the action was taken under color of state law, appellant sought damages under 42 U.S.C. § 1983 (2006).

The district court granted summary judgment for the city, concluding that appellant's takings claim was barred by the six-year statute of limitations and that, because GDP 151 had expired, the action was moot, and appellant lacked standing to pursue it. Despite granting summary judgment on these issues, the district court concluded that a genuine issue of material fact did exist with respect to appellant's condemnation claims. The district court denied summary judgment to the city on appellant's underlying condemnation claims. This appeal followed.

## ISSUES

I. When did appellant's takings claim become ripe?

II. Did the district court err by concluding that appellant's takings claim was moot because he failed to acquire subsequent development approval in a timely manner?

## ANALYSIS

On appeal from summary judgment, this court reviews the record to "determine whether there are any genuine issues of material fact and whether a party is entitled to judgment as a matter of law." *In re Collier,* 726 N.W.2d 799, 803 (Minn. 2007). Evidence in the record is viewed "in the light most favorable to the party against whom judgment was granted." *Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993). A genuine issue of material fact exists if the evidence would "permit reasonable persons to draw different conclusions." *Gradjelick v. Hance,* 646 N.W.2d 225, 231 (Minn.2002).

**I. The six-year statute of limitations did not begin to run until appellant's takings claim ripened upon the final decision of the city council in January 2001**

It is undisputed that an action for compensation for a taking of private property is subject to the six-year statute of limitations set forth in Minn.Stat. § 541.05, subd. 1 (1998). *Beer v. Minn. Power & Light Co.,* 400 N.W.2d 732, 736 (Minn.1987). The issue here is when the statute began to run.

Under Minnesota law, the statute of limitations begins to run "when the right to institute and maintain a lawsuit arises, when the action can be brought in a court of law without dismissal for failure to state a cause of action." *Levin v.*

*C.O.M.B. Co.*, 441 N.W.2d 801, 803 (Minn. 1989). The deciding factor, here, is when appellant could have brought an action in district court without being dismissed.

In *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, the United States Supreme Court held that a takings claim "is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." 473 U.S. at 186, 105 S.Ct. at 3116; *see also Hunkins v. City of Minneapolis*, 508 N.W.2d 542, 544 (Minn.App.1993) (applying *Williamson* in determining that a development plan must be submitted in order for the zoning board to make a final determination, and thus ripen a takings claim), *review denied* (Minn. Jan. 27, 1994). While the facts of *Williamson* differ from this situation, the finality doctrine applies here. In *Williamson*, after the county had approved a subdivision development plan, it amended its subdivision regulations making the preliminary plan noncompliant and difficult to build. *Id.* at 177–80, 105 S.Ct. at 3112–13. The landowner filed suit, claiming that the county had taken the property without just compensation. *Id.* at 182, 105 S.Ct. at 3114. The Supreme Court noted that the landowner had not availed itself of all opportunities for administrative relief since it could have applied to the Board of Zoning Appeals for variances from the zoning regulations but did not. *Id.* at 187–88, 105 S.Ct. at 3117. Since a final decision had not been made, the landowner's claim was not ripe. *Id.* at 194, 105 S.Ct. at 3120.

The Supreme Court emphasized that final decisions must be reached before a takings claim can be reviewed because the court needs to be able to determine

the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations. Those factors simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question.

*Id.* at 191, 105 S.Ct. at 3119 (citations omitted). Therefore, to satisfy finality under *Williamson*, a landowner must pursue all available local avenues for determining the scope of what the county will let him build before his claim is ripe. *See id.* at 186–94, 105 S.Ct. at 3116–20; *Thompson v. City of Red Wing*, 455 N.W.2d 512, 516 (Minn.App.1990), *review denied* (Minn. June 6, 1990); *see also Palazzolo v. Rhode Island*, 533 U.S. 606, 620, 121 S.Ct. 2448, 2459, 150 L.Ed.2d 592 (2001) ("Under our ripeness rules a takings claim based on a law or regulation which is alleged to go too far in burdening property depends upon the landowner's first having followed reasonable and necessary steps to allow regulatory agencies to exercise their full discretion in considering development plans for the property, including the opportunity to grant any variances or waivers allowed by law.")

Here, appellant exhausted all administrative avenues before filing his takings claim.[3] The city argues that appellant's

---

3. Any municipality with a zoning ordinance must provide by ordinance for a board of appeals and adjustments to consider land use appeals at the administrative level. Minn. Stat. § 462.354, subd. 2 (2008). This board has the power to hear variances "from the literal provisions of the ordinance in instances where their strict enforcement would cause undue hardship because of circumstances unique to the individual property under consideration." Minn.Stat. § 462.357, subd. 6(2) (2008). The City of Rochester created such a board of appeals under R.C.O. § 60.731. The Rochester ordinances also provide that "[a]fter all administrative remedies and local appeals have been exhausted" a party aggrieved

sole remedy following the council's July 5, 2000 decision was a direct appeal to the district court. But we have noted that the GDP was still incomplete at this point because details regarding land use, transportation, filling, ponding, road development, various city fees and improvement costs were lacking. The total impact of the city's conditions—particularly the economic impact—could not be realized until city staff settled these details in the draft development agreement. Appellant could not take the next step and enter a binding development agreement without a full analysis of the city's final staff input. *See Thompson,* 455 N.W.2d at 516 ("Economic impact and interference with expectation interests cannot be evaluated until after a *final application* of the regulations to the land in question." (emphasis added)). Particularly onerous are the conditions that require appellant to dedicate land to expand 40th Street and for ponding, to pay a "substandard street" fee, and to grade the property to street elevation. Appellant claims these and other infrastructure costs would exceed $2.3 million, would increase development costs by 400 percent, and would reduce the buildable site to 4.93 acres.

It was not until the ZBA variance hearing on October 4, 2000, that both appellant and the city were finally able to appreciate the physical and financial impact of the ten

conditions and review them in a formal administrative forum. Had the ZBA felt that it was jurisdictionally precluded from hearing the appeal, it should have refused to hear it or forwarded the matter to the city council without a recommendation. Instead, the ZBA denied the application and submitted its decision to the city council upon appellant's appeal of the refused variance.[4]

The council had never heard about the physical and financial effects on this project following the city staff's draft development agreement, which fleshed out the details of GDP 151. The additional staff input and details were produced *after* the June 2000 public hearings and the council's GDP approval on July 5, 2000. Notably, condition ten, the ponding condition, was added by the city staff after the council's June 5, 2000 decision and without a public hearing. Until the December 18, 2000 city council hearing, appellant had not had the opportunity to participate in a public hearing regarding condition ten and the GDP in its development agreement form.

Furthermore, the fact that the city council not only heard the appeal but first remanded it to the ZBA for findings of fact establishes that the council felt the need to hold a full hearing before issuing a *final* denial regarding the variance application. Had the city not heard the appeal, there would have been no finality in this matter,

---

by the decision can bring suit in district court. R.C.O. § 60.734.

4. The city admits that failure of the ZBA to hear the merits—rather than refusing to hear appellant's appeal for lack of jurisdiction—may have resulted in approval of appellant's variance under Minn.Stat. § 15.99 (2008). If the city was certain that, jurisdictionally, it was not required to hear and decide appellant's appeal, then Minn.Stat. § 15.99 should not have been a concern.

Under Minn.Stat. § 15.99, subd. 2, the city was required to act on appellant's request

otherwise a non-answer may have resulted in approval of the variance (GDP 151 without conditions). The statute provides that "an agency must approve or deny within 60 days a written request relating to zoning.... Failure of an agency to deny a request within 60 days is approval of the request." *See Breza v. City of Minnetrista,* 725 N.W.2d 106, 113 (Minn.2006) (stating that the court of appeals has strictly enforced the 60-day rule in a number of cases by "consistently holding that an agency's failure to comply with the section 15.99 timeline results in automatic approval of the request at issue").

as the July 5, 2000 decision did not contain all of the details of the conditions added to the GDP so the city could not consider the substantive effects and hardships of its earlier plan approval.

Regardless of the process by which the case returned to the city council, its return and the full hearing afforded both sides the final opportunity to review the benefits and burdens of the nine original conditions and the tenth staff-created condition. At the December 18, 2000 hearing, the city council had several options: (1) to remand the GDP and conditions to city planning/zoning staff for additional work in light of appellant's concerns; (2) to delete/modify the earlier imposed GDP conditions; or (3) to affirm the earlier GDP and conditions as now supplemented. By denying appellant's appeal, the council chose the last option.

Because the city council heard the appeal and had an opportunity to modify its earlier position, the January 3, 2001 decision became the final administrative decision. Appellant's cause of action thus ripened on January 3, 2001.

## II. The district court erred when it found appellant's claim moot for lack of subsequent approval

Generally, when an event makes an award of effective relief impossible or a decision on the merits unnecessary, the appeal should be dismissed as moot. *In re Application of Minnegasco,* 565 N.W.2d 706, 710 (Minn.1997). The mootness doctrine requires a comparison between the relief demanded and the circumstances of the case at the time of decision to determine whether there is a live controversy that can be resolved. *Id.* Mootness is a "flexible discretionary doctrine, not a mechanical rule that is invoked automatically." *Jasper v. Comm'r of Pub. Safety,* 642 N.W.2d 435, 439 (Minn.2002) (quotation omitted).

Additionally, a matter will not be dismissed as moot if (1) the issue raised is capable of repetition yet evading review or (2) collateral consequences attach to the otherwise moot ruling. *In re McCaskill,* 603 N.W.2d 326, 327 (Minn.1999). The capable-of-repetition-yet-evading-review exception may apply if " '(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again.' " *Kahn v. Griffin,* 701 N.W.2d 815, 821 (Minn.2005) (quoting *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975)). The rationale of the exception is that to " 'abandon the case at an advanced stage may prove more wasteful than frugal.' " *State ex rel. Sviggum v. Hanson,* 732 N.W.2d 312, 322 (Minn.App.2007) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, 192, 120 S.Ct. 693, 710, 145 L.Ed.2d 610 (2000)).

Here, not only is there a live controversy that can be resolved, but appellant did not have enough time to fully challenge the GDP before it expired and there was a reasonable expectation that he would be subjected to the same conditions if he were to renew the permit. Rochester Code of Ordinances § 61.216 states:

[T]he approval shall be valid so long as the applicant receives a valid subsequent development permit within two years of the General Development Plan approval. Except as provided through a subsequent development approval, development agreement, or action by the Council, the General Development Plan shall expire if no construction activity or subsequent development approval occurs for any two-year period.

Applying the city ordinance, the district court based its summary judgment decision on the fact that the GDP expired because appellant did not get subsequent approval within the two-year period after the GDP approval. But following the city council's final decision in January 2001, GDP 151 was no longer viable. All appellant had was a lawsuit; so asking him to "preserve the permit" through this ongoing litigation, would essentially be asking him to reinjure himself every two years. And there was nothing in the city council's January 3, 2001 findings to suggest that the city would eliminate or modify the ten conditions upon a renewal of the GPD every two years. Therefore appellant had no reason to renew his GDP.

Given that a genuine issue of material fact exists in regard to appellant's underlying takings claim, it is possible for appellant to be awarded damages on remand to the district court for a hearing on the merits.

## DECISION

We conclude that (1) because appellant's claim ripened in January 2001, not July 2000, the district court erred in holding that the statute of limitations for appellant's claim had run and (2) the district court erred in holding that appellant's claim was moot for failure to obtain a subsequent development approval within two years. The district court's denial of summary judgment to respondent city on the merits of appellant's underlying takings claim suggests that a genuine issue of material fact exists in regard to the actual takings claim; therefore, we reverse and remand.

**Reversed and remanded.**